James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,

v.

STRICKLAND TRANSPORTATION COMPANY, Inc., Appellee.

Nos. 15427, 15428.

United States Court of Appeals Fifth Circuit.

Dec. 13, 1955.

Rehearing Denied Jan. 11, 1956.

Earl Street, Reg. Atty., U. S. Dept. of Labor, Dallas, Tex., Bessie Margolin, Asst. Sol., U. S. Dept. of Labor, Sylvia S. Ellison, Atty., Washington, D. C., Stuart Rothman, Solicitor, Morton J. Marks, Washington, D. C., Eugene R. Jackson, New York City, United States Dept. of Labor, for appellant.

Ralph W. Currie, Dallas, Tex., Robert E. Currie, Somerset, Tex., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

BROWN, Circuit Judge.

These cases[1] present the common question: Under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., is a night watchman, who performs his duties under the circumstances here present, at an interstate motor truck terminal an employee rather than an independent contractor?[2]

1. No. 15427: Baccus, the night watchman, is the use plaintiff against Strickland to recover unpaid statutory overtime under § 16(c).

No. 15428: Suit under Sec. 17 of the Act to enjoin continuation of contract with Foster, successor to Baccus.

2. The contract, except for the date and name of the watchman service, was as follows:

"The State of Texas,
County of Dallas:

"This contract and agreement is made and entered into by and between Albert Robert Baccus Protective Service (a sole proprietorship of Albert Robert Baccus) of San Antonio, Texas, as one party, and Strickland Transportation Co., Inc., a Texas Corporation, of Dallas, Texas, as the other party; upon the following terms and conditions:

"Baccus Protective Service hereby agrees to furnish a night watch service for the Terminal of Strickland Transportation Co., said Terminal being located at San Antonio, Texas, during the following hours at each and every week this contract is in force:

\* \* \* \* \*

[Original May contract:
Week nights: 7:00 p.m. to 5:00 a.m.
Week ends: Saturday 1:00 p.m. to Monday 5:00 a.m.
Total: 90 hours
Amendment September 1952:
Week nights: 6:00 p.m. to 6:00 a.m.
Week ends: Saturday 1:00 p.m. to Monday 6:00 a.m.
Total: 102 hours]

"2. Baccus Protective Service agrees that it will have at least one of its employees on duty at said Terminal, at all hours specified in the above schedule, and such employee or employees of the said Protective Service will be competent to perform the duties and will be reliable, honest and sober.

"3. In consideration of such services rendered, the said Strickland Transportation Co., Inc., agrees to pay at its office in Dallas, Texas, to the said Baccus Protective Service, the sum of $86,50 per

The district court after a full trial answered it in the negative,[3] denying relief in each.

 We disagree. In so doing we do not put ourselves in the place of this distinguished, experienced trial judge in sifting, rejecting and weighing conflicting evidence. To the extent that this result is a rejection of his findings of fact, we hold them "clearly erroneous", F.R.C.P. 52(a), 28 U.S.C.A., on the broad concept that the total record will not justify the conclusion that these men were really independent contractors. Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217; Special Service Co. v. Delaney, 5 Cir., 172 F.2d 16.

The district court approached the problem entirely as one covered by the written contract, and he subjected it to scrutiny only to determine motive and purpose. In our view it is not solved by the conclusion that it was a technically effective instrument entered into with good faith, law-abiding intent. Conceding all this, the problem, as Mordecai at the gate, remains: Was the night watchman actually an employee despite the title and garb of independent contractor?

We think an examination of undisputed evidence demonstrates that except for the label each was an employee[4] in a very real sense. There is, first, the overwhelming impression that this whole thing was the use, literally, of a label[5] as such.

From Strickland's standpoint, it was an equal formality. None there claimed

week, payable weekly upon presentation of bill therefor.

\*　　\*　　\*　　\*　　\*

"In witness whereof the parties have hereunto set their hands in duplicate originals; Baccus Protective Service executing the same at San Antonio, Texas, on the 6th day of May, 1952, and Strickland Transportation Co., executing the same at Dallas, Texas, on the 6th day of May, 1952.

> Baccus Protective Service,
> Proprietor.
> By Albert Robert Baccus,
> Strickland Transportation Co.,
> Inc.
> By A. J. Weatherford,
> Terminal Manager."

3. It accepted the written contract at face value as having been "executed \* \* \* in good faith \* \* \* to secure an outside business organization to furnish \* \* \* night watch \* \* \* service" and performed by, "both parties strictly in accordance with the spirit and letter of its terms and meaning." Paraphrasing the Secretary's attack as an effort to show that the writing "was a subterfuge," it held that the evidence on this "was not convincing" as \* \* \* "the contract, was in reality what it purport[ed] to be."

4. Described during Congressional debates as, "the broadest definition that has ever been included in any one Act," 81 Cong. Rec. 7657, 75 Congress, 1st Session (1937), the Act provides:
 "Section 3. As used in this Act \* \*
 \*　　\*　　\*　　\*　　\*

"(g) 'Employ' includes to suffer or permit to work.
　\*　　\*　　\*　　\*　　\*
"(e) 'Employee' includes any individual employed by an employer.
　\*　　\*　　\*　　\*　　\*
"(d) 'employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee."

5. Baccus, a taxi driver, learning from a passenger (Norton, Strickland's dock foreman) that Webster, the current night watchman, was soon quitting, requested that he be given a chance at the job. In the meantime, Gorley, a young employee of the service station where Strickland trucks were serviced, replaced Webster. When he did, the contract (footnote 2, supra), previously transmitted from Strickland's Dallas Home Office, was used, describing him as, "\* \* \* Gorley Protective Service." Gorley (the son-in-law, incidentally, of Foster) disliked night work and quit. Norton then notified Baccus, who, in the "employment" interview, was told that he would work under a Gorley-type contract, a copy of which was shown him. Upon completion of his first tour of duty, he was presented, and signed, the contract then retyped. By it, this ex-taxi driver now saw himself described as "Albert Robert Baccus Protective Service." He undertook his duties May 6, 1952, served until March 2, 1953, when the contract was cancelled pursuant to notice because of unsatisfactory service, primarily repeated complaints from union truck drivers. Foster, in the meantime,

ever to have heard of the "Gorley," "Baccus," or "Foster" Protective Services or could have held any belief that they were acquiring the services of an established, recognized organization of demonstrated competence. They were looking at Gorley, Baccus and Foster as individuals in the light of their apparent capacity to do the work, whatever the tag.[6]

Equally compelling is the conviction that the work done was in actuality merely a routine, minute, integral part of the entire economic operation so performed as to be indistinguishable from the activities of those in the general employ of Strickland. Cf. Fahs v. Tree-Gold Co-op Growers of Florida, infra, Rutherford Food Corp. v. McComb, infra. Strickland, an interstate motor carrier, § 301 et seq., 49 U.S.C.A. has valuable cargoes in its custody awaiting shipment, delivery, or in transit, for which it has the exacting obligations of a common carrier. Safekeeping cargo and the needed trucks, trailers, terminals, and facilities for the transport is an indispensable phase of the business. Russell Co. v. McComb, 5 Cir., 187 F.2d 524; Slover v. Wathen, 4 Cir., 140 F.2d 258;

Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 129 F.2d 655.

Moreover, what the watchman did, the manner of performance, the duties exacted were essentially the same as other employees, and were not so isolated from operations that a genuine outside agency to "keep care" would likely have been entrusted with them. The terminal was relatively small, completely fenced in, requiring no patrolling rounds. An important activity was to receive, handle, and relay for action telephone calls, many of them emergencies, from trucks on the road and to make certain that truck drivers logged in and out.[7]

There was nothing done which required extraordinary skill or training, facilities, equipment, or organization which an outside agency could better have supplied or to warrant transferring management, discretion, control [8] and supervision of it to such outsider.

On this analysis, in this setting, if this simple, routine performance of an unskilled task to be undertaken by a single individual suffices, Strickland could mold individuals or minute groups

---

had stood watch occasionally for Baccus. He was obtained as a replacement. After performing service for about two weeks, he was shown for the first time, and signed, the same contract. For the preceding three years Foster had been an employee in the San Antonio City Park Department. He learned, by the contract, that he had now become the "Claude Foster Protective Service."

Use of a paper contract to meet exigencies is reflected also by the September 1952 revision which changed specified duty hours from 90 to 102 to correspond to the hours actually worked.

6. Strickland argues with great vigor that emphasizing the creation of three, new, modest protective services as an indication that each was really an employee, is to put a premium on bigness, prefer established over new businesses, and destroy the opportunity assured by our American free enterprise system to commence an obscure business with the hope and dream of prosperity and growth. We make no attack on a right so fundamental and vital. Where three obscure individuals with no known facilities or

organization, none of whom has had any experience or pretended to operate as a guarding service, are successively retained under a business title originated by the employing agency, it is hardly the creation and operation of a new enterprise.

7. We disregard the undisputed fact that Baccus and Foster performed many odd jobs and janitorial services. The trial court accepted the contention that this was purely voluntary to pass the time away during long night stretches, even though upon inquiry and complaint from Wage and Hour Division, this was discontinued midsummer 1953, after which Mrs. Foster performed this 6 hours per week for $1.00 per hour.

8. So far as the night watchman on the job was concerned, the shopworn direction and control test, even if applicable, is completely artificial. The night watchman was to watch; he could do it only by being on the premises; whether he walked or sat, or sat and walked, whether he looked first and listened next were merely unavoidable minutiae whether "employee" or "independent contractor."

into convenient categories, and then package, wrap and label them as independent contractors. That would frustrate the Act.

Only one factor gives us pause: The contract permitted, and each occasionally used substitutes whose wages were paid by Foster [9] or Baccus.[10] We believe, however, that in this total atmosphere this merely reflected an acquiescence in a practice or an implied right in the contract of employment, as such, rather than a manifestation of a business operation by each as entrepreneur.[11]

◼ A watching and protection service may constitute a permissible independent contract,[12] but on the applicable standards [13] we hold this to be employment, and as such in violation of the Act.

We, therefore, reverse No. 15428 (Foster) with directions to issue such orders as may be necessary to assure compliance in the future. Walling v. Florida Hardware Co., 5 Cir., 142 F.2d 444; Walling v. Youngerman-Reynolds Hardware Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; Walling v. Shenandoah-Dives Mining Co., 10 Cir., 134 F.2d 395; Walling v. Reid, 8 Cir., 139 F.2d 323; Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, modified on other grounds Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Walling v. Panther Creek Mines, 7 Cir., 148 F.2d 604.

◼ The Baccus claim is reversed for a new trial on the issue of the amount of unpaid statutory overtime, as we believe all of the evidence [14] should be freely received, analyzed and weighed in the light

9. Foster is positive that this was limited to the extended periods in 1953 when he was acutely ill and therefore not "competent to perform the duties" (par. 2 contract, supra). His treating Strickland's payments for Self-Employment tax, Cf. Fahs v. Tree-Gold Co-op Growers of Florida, 5 Cir., 166 F.2d 40, and wages to substitutes as business expense 1953 Income Tax Return is not significant. It was filed February 11, 1954, long after the field investigation by Wage and Hour Division alerted all parties to the possibility of a violation.

10. As to Baccus: substitutes were used 2 days, 1 week end, October; 6 days and 4 week ends, November, December 1952 @ $10.00 per night, $15.00 per week end; 1953 approximately 8 nights, January; and 16 nights, February @ $5.00 per shift while he was driving taxi.

11. With no indication that Baccus or Foster sought or obtained other watching jobs, the slight margin between the contract amount $86.50 and wages payable to three sub-employees at minimum wage 75¢ per hour 102 hours per week is so slight, that it demonstrates that they could not have placed economic reliance on the contract as a source of income independent of their own personal services.

12. Walling v. Sondock, 5 Cir., 132 F.2d 77, certiorari denied 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142; Bowman v. Pace Co., 5 Cir., 119 F.2d 858; Durkin v. Joyce Agency, D.C.Ill., 110 F.

Supp. 918, reversed Mitchell v. Joyce Agency, 7 Cir., 211 F.2d 241, reversed Trial Court affirmed 348 U.S. 945, 75 S.Ct. 436; Harrison v. Greyvan Lines, 331 U.S. 704, 709, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757; United States v. Silk, 331 U.S. 704, 712, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757; not "all who render service to an industry are employees."

13. Rutherford Food Corp. v. McComb, 331 U.S. 772, 67 S.Ct. 1473, 91 L.Ed. 1772; United States v. Silk, supra; Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 210 F.2d 427, certiorari denied Stewart-Jordan Distributing Co. v. Mitchell, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136; Fahs v. Tree-Gold Co-op Growers of Florida, 5 Cir., 166 F.2d 40; Tobin v. Anthony-Williams Mfg. Co., 8 Cir., 196 F.2d 547; Tobin v. La Duke, 9 Cir., 190 F.2d 677; McComb v. McKay, 8 Cir., 164 F.2d 40; see also Western Union Tel. Co. v. McComb, 6 Cir., 165 F.2d 65, 67, certiorari denied 333 U.S. 862, 68 S.Ct. 743, 92 L.Ed. 1141; Walling v. American Needlecrafts, 6 Cir., 139 F.2d 60, 62; Wabash Radio Corp. v. Walling, 6 Cir., 162 F.2d 391, 392, 393; Walling v. Twyeffort, 2 Cir., 158 F.2d 944, 946, certiorari denied 331 U.S. 851, 67 S.Ct. 1727, 91 L.Ed. 1859.

14. As we hold the relationship to be employment, no deduction is to be made for times his wife, or members of his family spelled him on the job, whether he was resting, sleeping, General Electric Co. v. Porter, 9 Cir., 208 F.2d 805, certiorari

of the existence of employment with whatever advantages the law accords to that status in establishing a claim under the Act. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–688, 66 S.Ct. 1187, 90 L.Ed. 1515, and see Mitchell v. Warren, 5 Cir., 213 F.2d 273.

Reversed with directions.

denied 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097; Central Missouri Tel. Co. v. Conwell, 8 Cir., 170 F.2d 641, Cf. Rokey

v. Day & Zimmerman, 8 Cir., 157 F.2d 734, or otherwise engaged on the premises.