George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

Salvador M. HINOJOSA, Individually and d/b/a H & H Meat Products Company, Defendant-Appellee.

No. 28475.

United States Court of Appeals, Fifth Circuit.

July 29, 1970.

Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Atlanta, Ga., Truett E. Bean, Trial Atty., U. S. Dept. of Labor, Dallas, Tex., Laurence H. Silberman, Solicitor of Labor, Bessie Margolin, Associate Solicitor, Carin Ann Clauss, Sylvia S. Ellison, Helen W. Judd, Attys., U. S. Dept. of Labor, Washington, D. C., Major J. Parmenter, Regional Solicitor, for plaintiff-appellant.

Moises Vicente Vela, Harlingen, Tex., for defendant-appellee.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

TUTTLE, Circuit Judge:

The Secretary of Labor appeals from a judgment, based on violations of the Fair Labor Standards Act, 29 U.S.C.A. 201, et seq., because of the trial court's failure to find additional violations of child labor, minimum wage and record keeping provisions of the Act, and because the trial court, although finding 23 violations, declined to enter the injunction sought by the Secretary.

■ We have carefully read the record and find that without exception the relief sued for by the Secretary is demanded by the undisputed evidence in the record, and conclude that the experienced trial court failed to note the strong thrust of the decisions of this court that, when repeated violations have occurred before the current suit was commenced, and the present violations are plain, and deal with easily understandable matters (such as minimum wages and record keeping requirements), an injunction is also legally demanded.

We, therefore, affirm that part of the judgment awarding overtime pay to the twenty-three persons, but reverse for further proceedings as to the wage entitlements for the remaining eleven persons on whose behalf the Secretary sued and for the entry of an injunction as prayed.

This is the third time this employer has been proceeded against by the Secretary. He was first convicted on a plea of nolo contendere under the Act's criminal provisions for violating its overtime and record keeping requirements.[1]

The second action was a civil complaint under Section 216(c) (a proceeding to recover wages underpaid). This resulted in a consent decree awarding overtime and back wages.

The present action was brought alleging violations as to 34 workers—22 students at substandard pay, four janitors or cleanup men, four butchers and the wife and young daughters of one of the cleanup men.

The trial court found that although Hinojosa hired the students at least partially from altruistic motives, saying that they did not supplant other labor by

---

1. Criminal proceedings under this Act are rare. They are not authorized except in the case of "willful violations." Section 216(a).

---

their being employed,[2] there was a violation of the wage requirements as to all of the students (some worked for as little as fifty cents an hour) and awarded back pay for them.

The trial court also found that although *no records* were kept for the janitor Hernandez, "I find that this employee did work *at least* 40 hours per week * * *" (Emphasis added.) As to another employee whom the court characterized as "a moronic type of employee, whose testimony, even under the painstaking questioning of this court, could not render much assistance towards any findings of the hours worked or duties performed," the court stated that as a favor to him, defendant hired him at $25 a week to clean the corrals. Nevertheless, the appendix submitted to this court, which is all we have to proceed on, contained the following questions and answers of this employee, Manuel Rodriguez Guerrera:

"Q. Do you remember how much you were paid for working at the H & H Meat Plant?

"A. $25.

"Q. $25 per week or per month?

"A. By the week."

Then on cross examination, the court asked:

"But that is not what he is asking you. When did you start cleaning, after the animals were taken out?

"A. When I started? All day, I was working there.

"Q. Well, what do you do in the morning cleaning the corrals, if they were full of cows and bulls?

"A. Outside of the corrals, I was working outside.

"Q. Doing what?

"A. To pick up lumber, get the trash, to put the trash in the cans."

Guerrera later testified that he cut the grass and cleaned around the corrals and picked up and stacked pieces of lumber.

It is conceded that Hinojosa kept no records for this man's work. The failure to keep records cast the burden on the defendant to disprove the testimony just quoted that he worked all day and received the sum of $25 per week. The fact that the employee was of slight intelligence did not justify the failure to keep records as to the time he spent performing his duties. No witness on the part of management supplied any information as to the number of hours worked by Guerrera. Thus there was no evidence or other factual basis for the court's determination that "this work could not possibly have taken more than three hours per day at the most." The court thus denied any relief as to Guerrera.

The court denied all other relief with respect to the other alleged infractions.

Principally, the other items of concern were the work done by two cleanup men who washed down the killing room each evening, Monday through Friday. Rodriguez Jiminez was regularly employed in the killing room, and then *at the end of the workday* he undertook for a period from November 3, 1967, to December 15, 1967, to clean the killing room at $10 per day. Jiminez told of the arrangement in the following language:

"Q. What are your duties?

"A. I'm a slaughterer, killing animals. I had two jobs, but now I have one, I was washing and killing.

"Q. All right. Was washing and killing livestock your regular duties?

"A. For some time I washed only.

"Q. Now, did you ever do some extra work and get some extra pay?

"A. Only when we went over the 40 hours.

"Q. Were you paid $10.00 for performing extra cleanup work?

"A. Washing, yes.

"Q. Would you kill the animals?

"A. Yes, sir.

2. Nevertheless the record shows that some of the students worked substantially more than the number of hours they would have been authorized under a vacational work program, and at substandard wages.

"The Court:

He has already said at least one time all he did was wash, then he started killing and washing. He already said that.

"Q. During the time that you worked there, did you punch a time card or punch a time clock?

"A. Yes, sir.

"Q. Now, for the wash-up work, were you on the time card record when you performed that work?

"A. No, sir.

"Q. What time of the day did you perform this wash-up work?

"A. After the killing, in the afternoon or in the evening.

"Q. Would you punch your time card and then go to do the wash-up work?

"A. Yes, sir.

"Q. Over what period of time did you perform this extra wash-up work, if you can remember?

"A. It wasn't too much. About a month or two.

"The Court:

Did you get paid extra for that?

"A. They would pay me for washing, $10.00.

"The Court:

And how long did it take you to wash down the place?

"A. Depending on whether there was a lot of—

"The Court:

On an average?

"A. I would get through about 8:30 or 9:00.

"Q. What hour of the day would you start the wash-up work?

"A. It was a question of when the killing was over. If the killing took late, I would be late. Most usually, it was from 5:00 o'clock I would start washing.

"Q. How many hours a day would it usually take you to complete the washing work?

"A. I couldn't tell you exactly because sometimes I would hurry up. About two or three hours only.

"Q. Would that be each day?

"A. Yes.

"Q. How many days a week?

"A. From Monday through Friday.

"Q. How much were you paid per day for this extra clean-up work?

"A. Ten dollars.

"Q. Did you receive that $10.00 regardless of the number of hours it took you to clean up, to finish the clean-up work?

"A. Yes, sir.

    *    *    *    *    *    *

Cross Examination.

    *    *    *    *    *    *

"By Mr. Vela:

"Q. Mr. Jiminez, is it your understanding—let me ask you point-blank. In other words, you had a contract with Mr. Hinojosa to clean up the killing floor after the slaughtering was done each day?

"A. Not a contract.

"Q. You did have an understanding?

"A. Yes, sir.

"Q. And you knew what the work entailed?

"A. Yes, sir.

"Q. Exactly what did you do?

"A. Wash the walls, the floor and the tables.

"Q. And that was it?

"A. Yes.

"Q. And when you were—you volunteered for this work, did you not?

"A. Yes, sir.

"Q. And you understood what was required of you?

"A. Yes, sir.

"Q. And when you were employed to do this, they left you to do it and you stayed there by yourself, under your own control and direction, is this correct?

"A. Yeah. They were helping me.

"Q. Well, who helped you?

"A. A nephew of mine.

"Q. Okay. What was his name?

"A. Miguel Serano.

"Q. And did you bring this boy to help you there clean up the walls and floors and tables on your own accord?

"A. Yes, sir.

"Q. And how long did he work there?

"A. The same time that I was there.

"Q. And did you pay him?

"A. When I quit that job, he didn't come back there to work any more.

"Q. Did you pay him?

"A. Yes, sir.

"Q. And how old was he?

"A. About 16 or 17 years. I don't know exactly the age.

"Q. And did you ask Mr. Hinojosa or Liborio or any of the other boys, or Salvador Hinojosa, whether or not they would give you permission to bring this boy?

"A. No, sir."

The court dealt with the Jiminez case in the following manner:

"Rodrigo Jiminez was regularly employed by the Defendant at $1.50 per hour with overtime compensation for all hours worked in excess of forty hours per week. Wanting to make more money, Rodrigo Jiminez asked that he be given the job of cleaning the killing floor at $10.00 per day, and during the period from November 3, 1967, to December 15, 1967, he was so employed, and was paid over and above what he was paid for his regular duties, at the rate of $10.00 per day. No record was kept of the number of hours devoted to such work, but as has been found, there is no question that the work could be easily done in between two and one-half and three hours.

"It is claimed by the Secretary that if you add three hours to the hours worked per week by Rodrigo Jiminez and considered them overtime hours, that for this period that he did this work he is entitled to $42.28.

"Jiminez himself was happy with the arrangement and glad to get the extra money.

"I find that the work that Rodrigo Jiminez did in cleaning the floor was contract work *for which he received more than the minimum rate per hour,* and that there was no violation of the Act with regard to him." (Emphasis added.)

Thus, the trial court's determination that Jiminez received more than the minimum rate per hour, seems inconsistent with, or irrelevant to, the court's statement that the work he did was "contract work." Moreover, the court's statement that "there is no question that the work could be *easily* done in between two and one half and three hours," (emphasis added) seems in conflict with the employee's statement that "it was from five o'clock I would start washing" and "I would get through about 8:30 or 9:00," even though he said later, "I couldn't tell you exactly because *sometimes* I would *hurry up.* About two or three hours only." Moreover, it is completely inconsistent with the testimony of the Sanchez family, later discussed, which was to the effect that Sanchez, his wife, and occasionally his two daughters worked several hours each night doing the same job. Hinojosa kept no record of the hours for this cleanup job, contending that Jiminez was an independent contractor, and not an employee. No person testified in behalf of the employer as to the length of time Jiminez worked.

While it is not always simple to determine whether a person, while engaged on a 40-hour week by an employer, performs additional services, is still an employee or an independent contractor, we are left with no doubt that whatever arrangement was made here was not of the nature that took Jiminez out of the employee relationship as to which he was entitled to the protection of the minimum wage and overtime provisions of the Act.

There is no dispute as to the basic facts relating to the engagement of Jiminez for the performance of the clean-up work after he finished his day's work as a slaughterer. The trial court's determination that these facts created the relationship of an independent contractor (if that is what the trial court really determined, which is left in some doubt by its discussion of the rates of pay and number of hours worked) is not a finding of fact which is bolstered by the clearly erroneous rule when reviewed by this court. In the early case of Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772, the Supreme Court as well as the Court of Appeals for the Tenth Circuit, Walling v. Rutherford Food Corp., 156 F.2d 513, treated such a finding as being subject to review as a matter of law, notwithstanding an elaborate disagreement on this point by Judge Phillips in the Court of Appeals. See 156 F.2d 513 at page 517. It is clear that the definition of employment, as used in the Fair Labor Standards Act, is "the broadest definition that has ever been included in one act." See United States v. Rosenwasser, 323 U.S. 360, 363, fn. 4, 65 S. Ct. 295, 297, 89 L.Ed. 301.[3]

In Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772, the court commented on the fact that the following factors were significant in its rejection of the claim that the employees were independent contractors: (1) The workers did a specialty job which was an integral part of the slaughter house operator's business; (2) the work was performed on the operator's premises and with his equipment; (3) the boners had no independent business organization; (4) the managing official of the plant kept close touch on the operation, and (5) the boners' profits depended upon the efficiency of their work and not upon their "initiative, judgment or foresight of the typical, independent contractor." 331 U.S. at 730, 67 S.Ct. at 1477.

These standards have been applied by courts of appeals throughout the country, including this court. See, for instance, Fahs v. Tree-Gold Co-op Growers of Florida, (5 Cir.) 166 F.2d 40, in which we held that so-called independent contractors, performing boxing operations at a stipulated rate per box and the workers they hired were all "employees" of the defendant under the Social Security Act, despite its lack of control over the number of employees hired by the contractors or their wages and hours. See also this court's decision in Mitchell v. Strickland Transportation Company (5 Cir.), 228 F.2d 124, 125, and Mitchell v. John R. Cowley & Bro., Inc. (5 Cir.), 292 F.2d 105. The language of this court in *Tree-Gold Co-op Growers of Florida* case, supra, although dealing with the Social Security Act, referred to the Supreme Court's decision in *Rutherford*, supra, and said:

"Under these decisions, the Act is intended to protect those whose livelihood is dependent upon finding employment in the business of others. It is directed toward those who themselves are least able in good times to make provisions for the needs when old age and unemployment may cut off their earnings [footnote omitted]. The statutory coverage is not limited to those persons whose services are subject to the direction and control of their employer, but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service.

"From the facts disclosed in the record, we are of the opinion that the services in question constituted a part of an integrated economic unit devoted to the packing of citrus fruit and fruit products. The work was simple,

3. Section 3 provides as follows: "As used in this Act * * *
(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to employee * * *

(e) 'Employee' includes any individual employed by an employer * * *
(g) 'Employ' includes to suffer or permit to work."

requiring no skill or experience, and was of relative permanence. None of the contractors had any investment in facilities, since the substantial tools and premises were furnished by the taxpayer. The degree of control exercised by the taxpayer was the same as would be expected if the contractors had been admitted employees, paid by the piece.

"However, the facts are weighed, they will not support a conclusion that the persons in question were not, as a matter of economic reality, dependent upon the taxpayers' business as their means of livelihood. Since the facts in the instant case and in the case of Rutherford Food Corp. v. McComb [footnote omitted], do not appear to be distinguished by any material degree, we think a corresponding result should be reached. There is no rule of thumb that defines precisely the relationship between the employer and the employee. Degrees of control, risks of loss, opportunity for profit, investment in facilities, permanency of the relations, and skill and workmanship, are all important for the decision. The entire situation controls the decision."

The Court there, on facts, much more susceptible of a finding of the existence of an independent contractor relationship than here, reversed the decision of the trial court, and remanded it for a determination that the so-called independent contractors were in fact employees.

The language used by this court in Mitchell v. John R. Cowley & Bro., Inc., supra, is also of significance. In that case the court said: "The Companies' main defense, successfully asserted below, is that Allen, the worker, was an independent contractor, not an employee. No doubt the formal written contract called him that.[4] But that is only the beginning of the problem, not the answer to it, [a footnote here states, 'Each contract specified that the company

would pay to Allen for the services furnished the sum of $25.00 per week payable biweekly.'] Mitchell v. Strickland Transportation Co., 5 Cir., 1955, 228 F. 2d 124."

The court then states: "This illustrates the wisdom of the approach followed in the F.L.S.A. situations which accords unusual significance to the highly specialized nature of the work to be done as a factor in determining whether one called a contractor is really not an employee. If a specific individual regularly performs tasks essentially of a routine nature and that work is a phase of the normal operations of that particular business, the Act will ordinarily regard him as an employee. Mitchell v. Strickland Transportation Co., 5 Cir., 1955, 228 F.2d 124, at page 127; Fahs v. Tree-Gold Co-op Growers of Florida, 5 Cir., 1948, 166 F.2d 40, at page 44; Rutherford Food Corporation v. McComb, 1947, 331 U.S. 722, at page 729, 67 S.Ct. 1473, 91 L.Ed. 1772."

■ Applying these standards, we are satisfied that Jiminez was an employee and not an independent contractor.

The same situation existed with respect to another cleanup man, Juan de los Santos. This man was a school janitor and he came to the plant to clean up the killing room at approximately 5:00 o'clock in the afternoon, and the testimony is that he worked from 6:00, 6:30 or 7:00 to 9:30, 10:00 or 10:30, and then specified that he worked "from three to three and one-half hours." Moreover, he testified that his wife worked with him every night that he worked, and she substituted for him on Friday night. Moreover, two daughters, one of whom was 14 years of age, worked two, three or four nights a week, according to whose testimony is to be believed. For this an arrangement was made to pay $10 per day. The check was actually made out to the man's wife. It is evident from the record that the employer was well aware of the presence in the

---

4. Of course, there is nothing in this case that could be called a "formal written

contract." At most the understanding was ambiguous.

plant of the wife and daughters during the performance of the work. The trial court said, "This is the same type of work that the court has found took no more than two hours and a half to three hours per day to perform." This finding is clearly erroneous when we consider the only testimony relative to the time spent by de los Santos, his wife and two daughters:

"Q. What hour of the day would you and your family usually start to work at the H & H Meat Plant?

"A. 6:00, 6:30 or 7:00.

"Q. What time of the day would you get finished?

"A. 9:30, 10:00, 10:30.

"Q. Can you tell the Court, on the average, about how many hours you and your family worked at the H & H Meat Plant every day that you worked?

"A. From three to three and a half hours.

"Q. Were you paid for this work?

"A. Yes.

"Q. How much were you paid?

"A. We made more or less something like a contract, something like that. He told us, 'I want you to do this work.' He told me then how much he was going to pay me for that work.

"Q. How much did he tell you he was going to pay you for that work?

"A. Fifty dollars."

Moreover, the court itself indicated its awareness of this time element for, on cross-examination, the following occurred:

"By Mr. Vela:

"Q. Mr. de los Santos, I didn't understand what amount of time would it normally take you and your family to clean up this killing floor. Per day, what number of hours?

The Court:

He said three to three and a half hours."

█ Thus, it is clear that the determination that de los Santos worked only two and a half to three hours per day was clearly erroneous. The undisputed record, as reproduced in the Appendix, discloses that he and his wife and his two daughters worked many more hours than three hours a day. As already indicated the state of the law dealing with such relationships requires that we hold de los Santos and his wife and daughters all to be employees rather than that de los Santos was an independent contractor.

There remains the question of the propriety of the deduction by the employer from wages of the cost of furnishing to four butchers knives and honing steel and specified articles of clothing as a condition of their employment. The employees involved were engaged at the minimum wage rate, and thus if the deduction for the cost of these items was improper, this would amount to a violation of the minimum wage provisions of the Act. Apparently the only exception to the requirement of the payment of wages at the minimum rate in dollars and cents is provided in Section 3(m) of the Act which states that under certain circumstances an employee's wage may include "the reasonable cost, as determined by the administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees. * * *"

The regulations issued pursuant to authority of Section 3(m) have, ever since the Act's inception, provided that "tools of the trade are not 'facilities' which an employer may count toward the payment of 'wages' required by the statute." [5]

5. "The cost of furnishing 'facilities' which are primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.

"The following list of facilities found by the Administrator to be primarily for the benefit or convenience of the employer is meant as illustrative rather than exclusive: (1) Tools of the trade and other

■■ We conclude that as used in the statute, the words "other facilities" are to be considered as being in pari materia with the preceding words "board and lodging." We, therefore, believe that the regulation prohibiting the deduction from wages of the items such as were charged to the employees by Hinojosa is a valid regulation, and is controlling here. The deductions thus made from the minimum wages paid to the four butchers were in violation of the provisions of the Act.

Although the trial court found violations of the Wage and Hour provisions with respect to 23 employees, and additionally, found expressly that no time records were kept with respect to at least two employees, whom the court identified as being regular employees as distinguished from independent contractors, and in spite of the fact that the criminal proceeding against Hinojosa had been based on his failure to keep records, and although the court recognized that as to at least one employee, so recognized, was underage for employment, the court considered that it was familiar enough with the defendant, Mr. Hinojosa, to determine that it should issue no injunction. The court stated:

"This court is familiar with the recent decisions of our circuit court with regard to the issuance of injunctions, but this court's familiarity with the defendant, as above observed, is such that equity compels this court to deny the sweeping injunction sought by the Secretary. The compliance of the defendant with a great majority of the regulations of the Fair Labor Standards Act leaves this court with the firm conviction that no violation has been wilfully or knowingly done by the defendant, and that what the Secretary terms as violations are not violations in accordance with the customs and practice of meat packing plants in this area."

It is difficult to understand the court's reference to the compliance of the defendant "with a great majority of the regulations," when in point of fact violations were found by the court as to approximately one-third of the number of persons ordinarily constituting the total work force of the plant, and violations of the record keeping provisions of the Act made it impossible for the court to ascertain accurately the amount of back wages due to two employees, one of whom the trial court said it was satisfied had worked "at least forty hours" and as to the other the court merely rejected the testimony of the witness who stated he worked five full days a week, and as to whom the employer kept no record to show the hours spent in return for his $25 a week paycheck.

In such situations this court has not been reluctant to "shift[s] the responsibility for compliance onto the employer's shoulders," thereby relieving the Secretary of "the responsibility of checking back on past violators to make sure that they are obeying the [Act]." Goldberg v. Cockrell (5 Cir.), 303 F.2d 811, 814, see also Gulf King Shrimp Co. v. Wirtz (5 Cir.), 407 F.2d 508.

■ As we have pointed out, "an injunction subjects [an employer] to no penalty, to no hardship, it requires [him] to do what the Act requires anyway—to comply with the law." Mitchell v. Pidcock (5 Cir.), 299 F.2d 281, 287. The facts in this case make as clear a situation for the requiring of an injunction as any case which has come to our attention.

The judgment of the trial court granting relief to the named employees is affirmed. The judgment denying relief to the other employees, including those characterized by the trial court as inde-

---

materials and services incidental to carrying on the employer's business; (2) the cost of any construction by and for the employer; (3) the cost of uniforms and their laundering, where the nature of the business requires the employee to wear a uniform. (29 C.F.R. 531.3(d) (1) and (d) (2)."

pendent contractors, and the members of their family working for them and the judgment denying an injunction is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.