Francisco **SOLER, et al.,**
**Plaintiffs–Appellees,**

v.

**G. & U., INC., et al.,**
**Defendants–Appellants,**

**and**

**Secretary, United States Department of Labor, et al., Defendants–Appellants.**

**Nos. 789, 790, Dockets 86–6166, 86–6190.**

United States Court of Appeals,
Second Circuit.

Argued March 2, 1987.

Decided Nov. 24, 1987.

Edward F. Bean, New York City (Donald S. Kruger, Judson K. Siebert, John W. Whittlesey, Keane & Beane, P.C., New York City, of counsel), for defendants-appellants.

Frederick M. Lawrence, New York City (Rudolph W. Giuliani, U.S. Atty. for the Southern District of New York, Steven E. Obus, Asst. U.S. Atty., on brief, George R. Salem, Sol. of Labor, Allen H. Feldman, Assoc. Sol. for Special Appellate and Supreme Court Litigation, Carol A. DeDeo, Deputy Assoc. Sol., Edward D. Sieger, U.S. Dept. of Labor, of counsel), for Federal defendants-appellants.

Thomas A. Harnett, Newburgh, N.Y. (Claudia A. Smith, Walter H. Reuhle, Farmworkers Legal Services of New York, Inc., Newburgh, N.Y., of counsel), for plaintiffs-appellees.

Jeffrey H. Kirby, New York Farm Bureau, Inc., Glenmont, N.Y., Michael J. Steintjes, American Farm Bureau Federation, Park Ridge, Ill., on brief (Lance D. Taylor, Mayer, Brown & Platt, Chicago, Ill., of counsel), as amicus-curiae.

Before OAKES and WINTER, Circuit Judges, and ZAMPANO, District Judge.[*]

ZAMPANO, District Judge:

The central issue raised on these appeals is whether the district court erred in setting aside as arbitrary and capricious the determination by the Department of Labor's Wage and Hour Administrator ("Administrator") that certain housing facilities furnished to migrant farm workers primarily benefited the workers and, therefore, could qualify in part as "wages" under § 3(m) of the Fair Labor Standards Act of 1983 ("FLSA"), as amended, 29 U.S.C. § 203(m) (hereinafter referred to as § 3(m)).[1]

We conclude that the district court exceeded the scope of its review authority under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"), that the Administrator's decision was not arbitrary and capricious, and that the case must be remanded to the district court for further proceedings.[2]

---

[*] The Honorable Robert C. Zampano, Senior United States District Judge for the District of Connecticut, sitting by designation.

[1] The district court's opinion is reported at 615 F.Supp. 736 (S.D.N.Y.1985). Other decisions in these consolidated cases are published at 690 F.2d 301 (2d Cir.1982); 578 F.2d 34 (2d Cir. 1978); 103 F.R.D. 69 (S.D.N.Y.1984); 568 F.Supp. 313 (S.D.N.Y.1983); 86 F.R.D. 524 (S.D. N.Y.1980); 477 F.Supp. 102 (S.D.N.Y.1979); 465 F.Supp. 261 (S.D.N.Y.1978); 443 F.Supp. 893 (S.D.N.Y.1978); 437 F.Supp. 60 (S.D.N.Y.1977).

[2] The farm owners also appeal the district court's findings that the FLSA violations were wilful, that the three-year statute of limitations governed the violations, and that liquidated damages should be awarded. 628 F.Supp. 720 (S.D.N.Y.1986). In light of our decision on the merits, we need not address these damage issues.

## I. BACKGROUND

### A. *FACTS*

From 1978 to 1984, the appellees were migrant farmworkers ("workers") who were employed, along with year-round laborers, to harvest crops grown on farms owned by six appellants in Orange County, New York. During the main growing season from May to September, the growers offered housing to those workers who preferred to live on the farms rather than seek living accommodations in nearby areas.

Prior to 1978, the resident housing was provided to workers without charge. However, after Congress amended the FLSA to extend the minimum wage provisions to include agricultural workers in 1978, the growers met with state and federal labor officials who concluded that it would be permissible under certain conditions to deduct the reasonable value of the housing facilities from the cash wages of each worker for whom lodging was provided. The growers thereafter generally deducted $.25 per hour from each on-site worker's pay.

In June 1978, the workers complained to the Department of Labor ("DOL") that the charges were unfair and, in July 1978, petitioned the Administrator to determine the fair value of the housing. Compliance officers from the Department commenced an investigation of the workers' claims[3] and, on July 25, 1980, the Administrator announced that an administrative hearing would be conducted to assess the appropriate amount for the housing deductions. In the meantime, the workers instituted suit in December 1978 in federal court challenging the validity of the housing charges, which action was stayed pending the outcome of the administrative proceedings. *See* 477 F.Supp. 102 (S.D.N.Y.1979).

### B. *THE ADMINISTRATIVE PROCEEDINGS*

Between September 8, 1980 and October 6, 1981, at the request of the Administrator, an Administrative Law Judge ("ALJ") held twenty-nine days of hearings on the housing deduction issue. At the hearings, all the parties were represented by counsel, twenty-six witnesses, including real estate experts, gave over 6500 pages of testimony, and 200 exhibits were introduced. In a comprehensive fifty-five page memorandum, the ALJ concluded, *inter alia,* that: 1) the lodging primarily benefited the workers; 2) no deductions would be allowed for periods in which the growers were not in compliance with sanitary regulations applicable to migrant housing; and 3) the fair rental value for the various housing in question ranged between $7.00 and $22.00 per week, per unit.

The Administrator's subsequent decision, filed on February 9, 1983, adopted most of the ALJ's findings,[4] concurred with the ALJ that substantial evidence supported the determination that the housing was furnished primarily for the benefit of the workers, and that, for reasons not relevant to these appeals, the range of fair rental values should be adjusted to $2.37 and $24.79 per week, per unit.

### C. *THE DISTRICT COURT'S DECISION*

Both the workers and the growers sought district court review of the Administrator's decision under the APA. While recognizing that the "scope of judicial review (under the APA) is narrow, and the court should not substitute its judgment for that of the agency," 615 F.Supp. at 740–41, the district court nevertheless concluded that the Administrator's decision should be set aside as "arbitrary and capri-

**3.** On January 5, 1978, most of the growers met with a compliance specialist from the DOL who outlined the permissible deductions. During 1978 and 1979, DOL compliance officers inspected the farms and requested cost information from the growers to justify housing deductions. In the interim, while the Administrator was making a final determination concerning reasonable housing deductions, the DOL imposed no penalties on growers who did not

exceed deductions of $12.50 per week. DOL compliance officers made it clear, however, that the permissible rate for deductions was yet to be determined.

**4.** Unless specifically noted, any reference made to the Administrator's decision also includes those findings and conclusions of the ALJ which the Administrator adopted.

cious" and "because the decision is not in accordance with the law." *Id.* at 741.

The district court supported summary judgment for the workers on both legal and factual grounds. First, it rejected the principle advanced by the Administrator that, under § 3(m) of the FLSA, a presumption exists that housing facilities, like meals, are a basic necessity for human existence and ordinarily should be included in an employee's regular rate of pay. An exception to this presumption, according to the Administrator, would be in special circumstances where the facilities "are found by the Administrator to be primarily for the benefit or convenience of the employer," under 29 C.F.R. § 531.3(d)(1). The district court characterized the administrator's position as "not consistent with the policy underlying the FLSA," 615 F.Supp. at 742 n. 13, and held that the controlling Regulation, 29 C.F.R. 531.3(d)(1), required that a balancing test be applied in all cases to determine whether the housing primarily benefitted the growers or the workers. *Id.* at 742. The failure to apply the requisite balancing test, in the district court's view, rendered the Administrator's decision arbitrary and capricious as a matter of law. *Id.* at 746.

Having established that a balancing of benefits standard was applicable to the housing issue, the district court then conducted its own review of the factual record, weighed the respective benefits of on-site housing to the workers and to the growers, and decided that on balance the only rational conclusion possible was that the housing primarily benefitted the growers. *Id.* The district court concluded that the growers improperly deducted housing costs from the wages of the workers, and consequently, granted various relief sought by the workers including back pay, liquidated damages, and attorneys' fees.

On these consolidated appeals, the growers and the Administrator contend that the district court exceeded the permissible scope of review of the Administrator's decision under the APA, that the housing deductions set by the Administrator were established in accordance with the FLSA and pertinent Regulations promulgated by the Administrator, and that, even assuming the prominent role of a balance of benefits test, substantial evidence warrants a finding that the housing was furnished for the primary benefit of the workers.

## II.  DISCUSSION

### A.  *SCOPE OF REVIEW UNDER THE APA*

It is settled law that under the APA a reviewing court may set aside an agency's decision only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court may not substitute its judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and, when a particular controversy requires an agency's reconciliation of conflicting and overlapping congressional policies, a court "should hesitate to disturb the administrative determination." *Hudson Transit Lines, Inc. v. United States*, 765 F.2d 329, 336 (2d Cir. 1985).

A successful challenge to an agency's decision under the arbitrary and capricious standard must clearly demonstrate that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). A reviewing court may neither weigh alternatives available to the agency and then determine which is the more reasonable, *see County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1383 (2d Cir.1977), nor resolve conflicts in the testimony "unless on its face it is hopelessly incredible." *NLRB v. Warrensburg Board & Paper Corp.*, 340 F.2d 920, 922 (2d Cir. 1965).

■ Moreover, particularly in view of the labyrinthine nature of the congressional and regulatory schemes for the administration of wage and hour legislation, "an agency's construction of its own regulation is entitled to substantial deference." *Lyng v. Payne*, 476 U.S. 926, ——, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986). Even if a court concludes that its alternative construction of the agency's regulation is "more equitable" or "more reasonable," the agency's interpretation of its regulation is not thereby rendered invalid. *Knebel v. Hein*, 429 U.S. 288, 294, 97 S.Ct. 549, 553, 50 L.Ed.2d 485 (1977). *See also Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

These principles guide the following analysis of the merits of the instant appeals.

B. *THE STATUTE*

Section 3(m) of the FLSA, as enacted in 1938 and in effect today with modifications not relevant for our purposes, defines "wage" to include:

> the reasonable cost, as determined by the Administrator, to the employer of furnishing [an] employee with board, lodging or other facilities, if such board, lodging, or other facilities are customarily furnished by [an] employer to his employees.

*See* 52 Stat. 1060 (1938) (current version at 29 U.S.C. § 203(m)).

The meaning and intent of this statutory language is clear: Congress explicitly authorized a wage paid by an employer to an employee to include the reasonable cost of lodging, board, and other facilities which confer similar benefits on employees, and which are customarily furnished by the employer to his employees. Thus, Congress

recognized that housing facilities, like meals, are essential for human existence and are ordinarily paid for from an employee's earnings. An employee has to reside somewhere, and therefore rental payments for the employee are usual and customary items of his or her living expenses. If an employer absorbs this expense for an employee, it is only equitable and reasonable that the employee "reimburse" the employer from wages earned. Congress, however, to ensure adequate wages and to prevent employer profiteering, *see Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706–07, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945), required that the housing credit for an employer be limited to the "reasonable cost" of the lodging furnished the employee. *Davis Bros., Inc. v. Donovan*, 700 F.2d 1368, 1370 (11th Cir.1983). It further mandated that the Administrator monitor housing deductions from employees' wages and, in the event of a dispute, resolve the issue through appropriate administrative proceedings.

In 1966, Congress extended the FLSA to cover agricultural workers, and thereby established the minimum wage for migrant and other agricultural workers. Pub.L. 89–601, §§ 103, 203, 80 Stat. 830, 832, 833–34 (1966). Although some members of Congress questioned the merits of allowing housing deductions for migrant workers, *see Hearings Before the General Subcommittee on Labor of the Committee on Education and Labor, House of Representatives*, 89th Cong., 1st Sess., on H.R. 8259, at 206 (part 1) (1965),[5] the Senate and House reports concurred that the minimum wage of agricultural workers could include "customarily furnished" housing, as long as the assessed cost was "reasonable" and

---

**5.** Representative Green cited the deplorable conditions in migrant labor camps: "I have visited a large number of migrant labor camps, and until Oregon passed some very stringent transportation laws that would provide with [sic] strict enforcement features and safety precautions, I have seen people herded into trucks like animals. I have seen housing provided for the domestic migrant farmworkers where the so-called respectable farmer would really not keep

his animals. It does seem to me that both the housing and the transportation ought to be deleted from this...." In essence, Representative Green proposed that the FLSA should make up for the deficiencies in state laws, i.e., the absence of transportation and housing safety laws. New York State has a health and safety law applicable to housing provided to migrant workers.

did not exceed the "fair value." [6] Congress did not want to disturb the presumption, consistent with previous amendments to FLSA, that housing was deductible from the minimum wage.[7]

Giving "due regard to the plain meaning of statutory language and the intent of Congress," *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945), we conclude that § 3(m) facially answers the precise issue raised on these appeals and, were it not for the district court's reliance on the statute's implementing Regulation, 29 C.F.R. § 531.3(d)(1), it would end the matter. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

## C. *THE REGULATION*

■ While the explicit reference to housing and board in § 3(m) implies that reasonable costs of those facilities are presumptively compensation, the statute leaves open the question whether an employer's payments for "other facilities" are includable in an employee's wage. Presumably, Congress recognized that employer-furnished facilities may vary from job to job and over time, and intended that the Administrator determine the issue of what "other facilities" should be included as wages on a case-by-case basis.

It seems evident that § 531.3(d)(1) was promulgated to provide guidance for the identification of items that may be considered to be in pari materia with "board and lodging":

> The cost of "facilities" found by the Administrator to be *primarily for the benefit or convenience of the employer* will not be recognized as reasonable and may not therefore be included in computing wages. (emphasis added)

In practical effect, the balancing of benefits test established by the Regulation provides a common-sense and logical approach to resolve the reasonableness of costs for facilities *other than lodging and board* that may be counted toward the payment of an employee's wage: If the item in question primarily benefits the employer, the cost of that facility will not be recognized as reasonable and will not be an allowable inclusion in an employee's wage; if the item primarily benefits the employee, it will be construed to be a reasonable cost, like housing and meals, within the meaning of § 3(m).

Other regulations issued pursuant to the authority of § 3(m) as well as decisional law comport with this analysis. *See, e.g.,* 29 C.F.R. § 531.3(d)(2) (an employer's expenses for tools of the trade, construction by and for the employer, and certain uniforms are not reasonable costs deductible from wages); 29 C.F.R. 531.32 ("other facilities" within the meaning of § 3(m) must be something like board or lodging); 29 C.F.R. 778.217 (payments by employer to cover sums which employee expended for convenience of employer are not part of wages); *Masters v. Maryland Management Co.*, 493 F.2d 1329, 1334 (4th Cir. 1974) (uniforms required by employers are not "facilities" within meaning of § 3(m)); *Shultz v. Hinojosa*, 432 F.2d 259, 266–67 (5th Cir.1970) (costs of furnishing tools of the trade may not be deducted as reasonable costs under § 3(m)).

This is not to say, however, that in all cases the statutory presumption that housing and board are reasonable costs exempts on-site housing facilities from the scrutiny of the Regulation's balancing test safeguard. Special circumstances may exist where lodging is of little benefit to an

---

6. In 1966, when the FLSA amendments were passed, the Senate and House reports emphasized that the minimum wage included "[r]oom, board, and other facilities" customarily furnished to these employees, "according to their fair value or reasonable cost." H.R.Rep. 1366, 89th Cong., 2d Sess. 30 (1966); S.Rep. 1487, 89th Cong., 2d Sess. 19 (1966), U.S.Code Cong. & Admin.News, pp. 3002, 3021.

7. Congress could have explicitly exempted migrant workers from § 3(m) but did not. Similarly, in 1949, Congress rejected a proposed amendment to § 3(m) that would have exempted housing deductions for seaman, railroad workers, and employees in isolated labor camps. *See* H.R.Rep. 267, 81st Cong., 1st Sess. 2, 24, 33, 38 (1949), and 95 Cong.Rec. 6482–86 (1949) (text of bills); *see also, e.g.,* 95 Cong.Rec. 12580–83 (1949) (rejection of amendment of § 3(m) to exempt seamen).

employee, such as when an employer requires an employee to live on-site to meet a particular need of the employer, *see Marshall v. Truman Arnold Distrib. Co., Inc.,* 640 F.2d 906 (8th Cir.1981) (Secretary of the Department of Labor argued that gas station employee was on premises to deter vandalism), or when an employee is required to be "on call" at the employer's behest. Recourse to the Regulation's protection is best left to the Administrator's judgment based on the facts of particular cases submitted to him. Where the statutory presumption is rebutted by substantial evidence demonstrating that the housing is not a benefit running primarily to the employee, but rather a burden imposed upon the employee in furtherance of the employer's business, the Administrator is empowered to find that the cost of on-site housing is not reasonable, and therefore may not be subsumed within an employee's wage.

We conclude that as a general rule the Administrator may rely on the statutory presumption accorded housing facilities under § 3(m), but that in appropriate circumstances, as determined by the Administrator, the presumption is subject to challenge and rebuttal under the Regulation's balancing of benefits standard.

### D. *THE DISTRICT COURT'S APA REVIEW*

■ As previously noted, the district court granted summary judgment for the workers on the ground that the housing facilities were furnished primarily for the benefit of the growers. To reach that conclusion, the court set aside the Administrator's findings as arbitrary and capricious, and substituted its judgment on the issue by weighing and balancing the evidence in the record relating to the benefits provided by the on-site housing.

As a matter of law, this approach was erroneous. The statute, not the Regulation, governs the case sub judice. Thus, in the absence of substantial evidence to the contrary, we regard the language of the statute authorizing a wage deduction for reasonable housing costs as conclusive and binding both on the Administrator and the reviewing court. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

On the facts, our independent review of the pleadings and evidence in the administrative record, *see Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Virginia Agricultural Growers Ass'n v. Donovan,* 774 F.2d 89, 93 (4th Cir.1985), reveals that the Administrator properly relied on the statute, which we have determined creates a presumption of deductibility, thereby eliminating the necessity for the Administrator to collect, sort and weigh benefits under the Regulation.

The petition submitted by the workers to the Administrator sought "a determination of reasonable cost and/or fair value of lodging" furnished by the growers to the workers (A–683). The bulk of the evidence introduced by the parties addressed the issue of valuation, and the main, if not the only, focus at the administrative hearings was upon the worth of the housing under § 3(m), and not whether housing deductions were allowable at all under § 531.3(d)(1).

■ The evidentiary hearings conducted by the ALJ were comprehensive and fair, and in our view disclose substantial factual evidence to support the finding that the housing was a reasonable cost attributable to income. Among other factors, the workers were not required to live on the farms as a condition of employment; the growers employed many farmworkers from the local communities; off-site housing, albeit to a limited extent, was available; the workers were not "on call," and reporting to work was optional; resident workers did not incur daily transportation costs to and from the farms; during weeks in which work was not available, there was no charge for lodging; a substantial number of workers would be unemployed were it not for the growers' farms; the on-site housing provided comradeship to many who did not speak English; and, to the extent that the housing was shown to be substandard, the Administrator limited the

amounts the growers could credit for such housing against the workers' wages.[8]

Accordingly, the district court's grant of summary judgment is reversed; the case is remanded to the district court to review the Administrator's determinations relating to the fair rental value of the housing facilities.

OAKES, Circuit Judge (dissenting):

I dissent.

The majority seems to approve the ALJ's conclusion—adopted largely without comment by the Administrator—that the housing provided by these growers to migrant workers during the employment season was "primarily for the benefit of the employees," and thus its fair value could be deducted from the minimum wage. The "benefit" these workers received was an extremely base level of shelter in substandard buildings, many of which were structurally unsound, unsanitary fire hazards, lacking indoor plumbing and adequate ventilation, surrounded by fields sprayed with pesticides. *Soler v. G & U, Inc.*, 615 F.Supp. 736, 746 (S.D.N.Y.1985). According to the ALJ, the workers benefit from this housing through "worker comradeship" and reduced transportation costs, as indicated by the fact that no worker chose to live elsewhere. In the ALJ's view, these benefits more than offset the benefit to the employer of the "mere presence of the workers on the farm."

This analysis, however, ignores the most blatant evidence that the growers provided housing solely because their businesses could not function without it. For this reason I think the district court correctly found the Administrator's decision "arbitrary and capricious." *See Motor Vehicles*

*Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (reviewing court should " 'consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment' " (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)); *National Black Media Coalition v. FCC*, 791 F.2d 1016, 1024 (2d Cir.1986) (same).

I agree with the majority that, because in most cases housing and board primarily benefit the employee, 29 U.S.C. § 203(m) establishes these as presumptively "reasonable costs" deductible from wages. Whether in a particular case that presumption has been rebutted is determined by balancing the relative benefits to an employer and employee. I cannot, however, agree with the majority that to overcome the presumption requires either a showing that the lodging "is of little benefit to an employee," or "substantial evidence" that the housing is "a burden imposed upon the employee in furtherance of the employer's business." Both logic and case law dictate that a "facility" may benefit an employee substantially and yet *primarily* benefit the employer.[1] *See Masters v. Maryland Management Co.*, 493 F.2d 1329, 1334 (4th Cir.1974); *Schultz v. Hinojosa*, 432 F.2d 259, 266–67 (5th Cir.1970).

The district court listed five measures of benefit to the employer—maintaining an adequate work force, increased efficiency, the nature of the job, accomplishing the job, and practice in the trade or business. Although the ALJ did not make specific factual findings on the extent to which the

---

8. This is consistent with 29 C.F.R. § 531.31, which states that [f]acilities furnished in violation of any Federal, State, or local law, ordinance or prohibition will not be considered facilities 'customarily' furnished."

1. This principle is clearly demonstrated in cases dealing with 29 U.S.C. § 203(m)'s analogue in the tax laws, 26 U.S.C. § 119(a) (1982). *See, e.g., Adams v. United States*, 585 F.2d 1060, 1063–65 (Ct.Cl.1978) (chief executive officer's house furnished for employer's convenience). I believe that even under the strictest formulation

of this test, that is, whether the benefit given an employee is provided "solely because the employer's business could not function properly unless an employee was furnished that benefit on the employer's premises," *Commissioner v. Kowalski*, 434 U.S. 77, 85, 98 S.Ct. 315, 320, 54 L.Ed.2d 252 (1977), the housing given to these workers could not be considered "compensation." It appears anomalous to me that such housing could at the same time be considered "wages."

growers depended on migrant labor or on the availability of off-site housing, there was evidence in the record that clearly showed the growers more than 50% dependent on nonlocal labor and the very limited availability of alternative housing, at a price beyond the reach of the workers.[2] Moreover, the ALJ found that the payroll deductions covered in most cases only 60% of the cost of providing housing to workers. No profit-seeking business would furnish housing on this basis unless doing so would enable it to reap substantial efficiency benefits or unless it were necessary to attract an adequate number of workers. That the growers provided no more (and sometimes less) than was required to meet minimum standards of habitability leads inescapably to the conclusion that this housing was provided solely because it was the least that was absolutely necessary to the operation of the growers' businesses.

Another benefit listed by the ALJ, "worker comradeship," borders on the outrageous. The facts here showed that groups of five or more people sometimes cohabited in one small apartment, and that the state-approved occupancy levels were at times exceeded in the various camps. Clearly, one man's "comradeship" is another man's overcrowding. While, as the majority notes, "resident workers did not incur daily transportation costs to and from the farms," it seems unlikely that on-site housing was provided primarily for the workers' convenience. More plausibly, the growers locate housing on the farms to control costs associated with attracting an adequate work force. Moreover, the employer provides itself with a labor pool that is available at flexible hours and on short notice—an important consideration in a business subject to the notorious vicissi-

tudes of nature. At most, the employees benefit only incidentally, and where off-site housing is nonexistent, any benefit from reduced transportation costs is illusory.

Of course, the workers do benefit from not having to secure and maintain alternative housing, but, again, the degree to which they benefit depends upon the existence of alternative housing and the quality of that housing. Though I concede that to some extent the statutory scheme already accounts for quality through the determination of the "fair value" of the housing provided, it does not dispose of the threshold question of whether the deduction of that "fair value" is authorized as "reasonable."[3]

Finally, that the growers, who had always provided housing for migrant workers, first began to deduct charges for that housing immediately following the extension of the FLSA's coverage to agricultural workers, seems to me an obvious attempt to evade what the Government admits was the primary purpose of section 203(m): "to prevent increases in charges for rent, board, groceries, and merchandise, so as to offset the increase in wages provided and intended by the Act." *Walling v. Peavy–Wilson Lumber Co.*, 49 F.Supp. 846, 862 (W.D.La.1943); *see also* 83 Cong.Rec. 7408 (1938).

Applying the above considerations, I agree with Judge Tenney that "[t]he record indicates that although the plaintiffs received some benefit from the housing provided, the labor camps were set up primarily for the growers' benefit since the housing was needed to ensure an adequate workforce to operate the farms." 615 F.Supp. at 749. Indeed, I believe this is the only conclusion that can be reached from

---

**2.** The suggestion that "the growers offered housing to those workers who preferred to live on the farms rather than seek living accommodations in nearby areas," if not tragically unreal, is almost risible. As Judge Tenney noted, "[b]oth sides agree that the migrant workers could not afford to work for the growers if housing were not provided." 615 F.Supp. at 739.

**3.** Nowhere does the Administrator account for the special nature of migrant labor; rather, the

ALJ's analysis appears to be founded on a stationary local work force model. In reality, however, the migrant worker may more closely approximate the model of the employee who travels to accomplish his employer's business, the cost of whose out-of-town accommodations is specifically not recognized as "reasonable" and, therefore, may not be included in computing wages under 29 C.F.R. § 778.217(b)(3) (1987).

these facts. *Cf. Pollgreen v. Morris,* 770 F.2d 1536, 1545 (11th Cir.1985). Therefore, I would affirm the decision of the district court.