Francisco SOLER, et al., Plaintiffs,

v.

G & U, INC., Charles Gratz, d/b/a Charles Gratz Farm, et al., Defendants.

Jann S. FLING, et al., Plaintiffs,

v.

PEAT–GRO FARMS, INC., Defendant.

Pablo LIVAS, et al., Plaintiffs,

v.

BIERSTINE FARMS, INC., Defendant.

Gilberto GONZALEZ, et al., Plaintiffs,

v.

CEDAR VALLEY GROWERS, INC., Defendant.

Freddy VALENTIN, et al., Plaintiffs,

v.

Raymond MYRUSKI, Defendant.

Cecilio ENCARNACION, et al., Plaintiffs,

v.

W.K.W. FARMS, INC., Defendant.

SOLER, et al., Plaintiffs,

v.

U.S. SECRETARY OF LABOR, et al., Defendants.

G & U, INC., et al., Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR, et al., Defendants.

Nos. 78 Civ. 6252(CHT), 78 Civ. 6257(CHT)—78 Civ. 6261(CHT), 80 Civ. 3506(CHT) and 83 Civ. 9122(CHT).

United States District Court, S.D. New York.

July 24, 1991.

Farmworker Legal Services of New York, Inc., New Paltz, N.Y. (Dan Getman, Charlotte Sibley, of counsel), for plaintiffs.

Keane and Beane, P.C., White Plains, N.Y. (Edward F. Beane, Susan T. Travis, of counsel), for defendants.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for the Government.

## OPINION

TENNEY, District Judge.

Plaintiffs, approximately 100 migrant farmworkers ("migrant workers" or "workers"), instituted this consolidated action under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* (1988) ("FLSA"), against defendants, six farm owners in Orange County, New York ("owners").[1] The workers seek to recover "rent" deducted from their wages by the owners for the on-site housing which the owners provided during the 1978–83 growing seasons. The workers argue that in deducting the "rent" from their wages, the owners violated the minimum wage provisions of the FLSA. *See* 29 U.S.C. § 206.[2]

---

1. The former United States Secretary of Labor, Raymond J. Donovan, and the Department of Labor are also defendants in this action, and are hereinafter referred to collectively as "the government."

2. For a thorough history of this case, *see Soler v. G & U, Inc.,* 833 F.2d 1104 (2d Cir.1987), *cert. denied,* 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988), and the decisions cited therein at n. 1.

In a prior decision, the court stayed the proceedings in this case, pending an administrative hearing before an Administrative Law Judge ("ALJ") and a final determination by the United States Department of Labor's Wage and Hour Administrator ("Administrator"). *See Soler v. G & U, Inc.*, 477 F.Supp. 102 (S.D.N.Y.1979). In November 1983, the Administrator issued his final decision, in which he found, *inter alia,* that the on-site housing was primarily for the benefit of the workers rather than the owners, and that its fair rental value was therefore deductible from the workers' wages. Administrator's Decision, Exh. E to Plaintiffs' Notice of Motion for Partial Summary Judgment ("Plaintiffs' Notice of Motion"). Thereafter, the workers and the owners sought judicial review of the Administrator's decision under the Administrative Procedure Act, 5 U.S.C. § 706(2) (1988) ("APA"), and cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56(c).

This court found that the housing provided to the migrant workers was primarily for the benefit and convenience of the owners, and that, therefore, its costs could not be included as "wages" under § 203(m) of the FLSA.[3] After concluding that the Administrator failed to consider all the relevant factors, this court set aside—as arbitrary and capricious—his determination that the housing was primarily for the benefit of the workers, and granted summary judgment in favor of the plaintiffs. *Soler v. G & U, Inc.*, 615 F.Supp. 736 (S.D.N.Y.1985). The Second Circuit reversed, finding that this court had exceeded the scope of its review authority under the APA, and that the Administrator's decision was not arbitrary and capricious. The case was remanded for this court "to review the Administrator's determinations relating to the fair rental value of the housing facilities." *Soler v. G & U, Inc.*, 833 F.2d 1104, 1105, 1111 (2d Cir.1987), *cert. denied*, 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988). Once again, the migrant workers and the owners have cross-moved for summary judgment based on the administrative record.

For the reasons set forth below, the Administrator's decision is affirmed in part and reversed in part. In addition, the court's prior award of liquidated damages is replaced with an award of prejudgment interest.

## BACKGROUND

Defendant owners are in the business of growing and harvesting crops such as onions, lettuce, and celery. In addition to their permanent employees, the owners hire migrant workers on a seasonal basis and pay them the hourly minimum wage. During the main growing season, the owners provide on-site housing to most of the migrant workers.[4] If housing were not provided, it is unlikely that the workers would be able to obtain off-site housing. Both sides agree that the migrant workers could not afford to work for the owners if housing were not provided. *Soler,* 615 F.Supp. at 739.

Prior to 1978, the on-site housing was provided to the migrant workers free of charge. In 1978, however, Congress amended the FLSA's minimum wage provisions to apply to agricultural workers.[5] Since the FLSA provides that the wage paid to an employee may include the reasonable cost to the employer of furnishing the employee with lodging, *see* 29 U.S.C. § 203(m), the owners began to charge the migrant workers for their housing. From 1978–83, the owners charged each worker between $8 and $12.50 a week for the lodging. In general, the owners withheld $.25 per hour from the wages of each worker for whom housing was provided.

In July 1978—after complaining to the Department of Labor that the wage deductions were unfair—the migrant workers petitioned the Administrator to determine the

---

3. The housing in question ranged from one-person cabins to dormitory style facilities.

4. The record indicates that there are not enough workers available in the neighboring area to satisfy the owners' labor needs. *Soler,* 615 F.Supp. at 739.

5. It is not disputed that the migrant workers are covered employees under the FLSA.

fair value of the housing. Thereafter, the Administrator ordered that a hearing be held by an ALJ. The ALJ concluded that the determination of the fair rental value of the on-site housing would require the services of a real estate appraisal expert. Accordingly, the ALJ directed the Department of Housing and Urban Development to make an appraisal of the subject lodgings ("the HUD appraisal"). In addition, the owners hired a different real estate appraiser to make an independent appraisal ("the owners' appraisal"). During the course of the administrative hearing, the ALJ heard a total of twenty-nine days of testimony from twenty-six witnesses, including the two real estate appraisers.

Both appraisers agreed that their assignments were unique and that the "market data" approach was the only viable method of valuation in this case.[6] Administrator's Decision at 4. In using the market data approach, a fair rental value is determined by 1) comparing the property in question to similar property in the general geographic area, 2) determining the rental value of the similar property, and 3) making whatever adjustments are needed to the rental value, if any, to reflect the differences between the property in question and the comparable property. *Id.;* HUD Appraisal at 7–8, Exh. C to Plaintiffs' Notice of Motion.

In conducting his appraisal, the HUD appraiser examined fifteen low income housing units in the general area of the owners' farms. After eliminating both the high and low extremes of the rental spectrum, the HUD appraiser calculated that the typical rent for the rural housing was $20 per person, per week. HUD Appraisal at 11. This figure was based upon an average occupancy of two persons per bed-

room and included adjustments for utilities.[7] *Id.* at 9.

The HUD appraiser recognized that the rural rental housing was superior to the workers' housing in several respects. To account for the differences, the appraiser made downward adjustments from the $20 rural rental baseline in three areas: 1) "market limitations," 2) "livability," and 3) "functional utility." Market limitations involved an adjustment primarily to reflect the remote location of the migrant housing, far removed from towns and villages. *See* Tr. 2971–71, 3028, 3093, 3730.[8] For two of the migrant worker camps, the downward adjustments for market limitations were 20% and 15%; for the remaining properties the downward adjustment was 10%. Livability focused on whether the housing satisfied a tenant's basic needs, with emphasis on sanitary facilities. *See* Tr. 2958–60. Deductions for livability were as high as 55%. *See* HUD Appraisal at 33. Functional utility related to the attractiveness and usefulness of the property, with emphasis on the layout, room and closet size, and the type of walls and floors. *See* Tr. 2959–60. Deductions for functional utility were as high as 40%. HUD Appraisal at 24.

Based upon his inspections of the on-site lodging, the HUD appraiser determined the percentage deduction for each individual housing unit under each of the three above mentioned categories. The sum of the three percentages was then subtracted from the $20 baseline figure to arrive at the weekly per person fair rental value of each of the units. The HUD appraiser calculated the fair rental values to range from $0 to $18, with twenty-six of the thirty-two sites having values of $10 or less.

---

**6.** Since neither party challenges the Administrator's decision to generally adopt the HUD appraisal rather than the owners' appraisal, the court will only address itself to the HUD appraisal.

**7.** The workers object to the appraiser's use of double occupancy as the norm for the rural rental housing. They contend that such an assumption is inconsistent with the evidence in this case which indicates that the on-site housing units usually housed more than two persons

per bedroom. Plaintiffs' Memorandum of Law in Support of Partial Summary Judgment ("Plaintiffs' memo. in Support") at 26–27. However, the double occupancy assumption was used solely to calculate the per person value of the rural rental housing; it was not intended to approximate the occupancy of the migrant worker housing units. *See* HUD Appraisal at 9.

**8.** Citations with "Tr." refer to the transcript of the administrative hearing.

Both the ALJ and the Administrator accepted the HUD appraiser's calculations with a few exceptions. First, both the ALJ and the Administrator rejected the appraiser's standard 10% deduction for market limitations. *See* ALJ's Recommended Decision at 38–39, Exh. G to Plaintiffs' Notice of Motion; Administrator's Decision at 12. As discussed *supra*, the HUD appraiser predicated the 10% market limitation deduction primarily on the fact that the migrant worker housing was located at a distance from towns and villages. However, since the comparable units used by the HUD appraiser in setting the $20 baseline were also rurally located, and because "the presence [of the housing] at the farm is a positive factor [for the migrant workers] at least with respect to transportation cost savings," the ALJ and the Administrator did not accept the HUD appraiser's standard 10% deductions.[9] *Id.* Second, the Administrator accepted the ALJ's recommendation that $1 be added to each weekly rental calculated by the HUD appraiser to reflect excessive maintenance costs. *See* Administrator's Decision at 12; ALJ's Recommended Decision at 41–43.

On March 31, 1982, the ALJ issued his Recommended Decision, which concluded, *inter alia*, that: 1) the housing primarily benefited the workers; 2) no deductions should be allowed for periods during which the housing was not in compliance with the New York law; 3) heating fuel is properly chargeable to the workers; and 4) the fair rental value of the housing sites in question ranged from $7 to $22 per person, per week. ALJ's Recommended Decision; *Soler*, 833 F.2d at 1106.

On February 9, 1983, the Administrator issued his decision, which he amended on November 15, 1983 in order to clarify certain issues raised by the parties. *See* Administrator's Decision; Amendment to Decision of the Administrator ("Amended Decision"), Exh. F to Plaintiffs' Notice of Motion. In his decision, the Administrator

adopted most of the ALJ's findings. However, he rejected the ALJ's findings that heating costs were properly chargeable to the workers, and that "lodging, if legally permissible, anywhere in this country is worth no less than $1.00 per person, per day." Administrator's Decision at 14–15. The Administrator also found, contrary to the ALJ, that certain of the owners' housing units lacked heating facilities in violation of the New York State Sanitary Code, and that the owners should be denied wage deductions for those facilities. Administrator's Decision at 15; Amended Decision at 4; ALJ's Recommended Decision at 23–24. Thereafter, the Administrator adjusted the fair rental values to range from $3 to $21.[10] Administrator's Decision at 16.

The workers argue that the Administrator's determination of the fair rental value of the housing was arbitrary and was not supported by substantial evidence. Alternatively, the workers claim that the Administrator erred by disallowing the appraiser's 10% downward adjustment for "market limitations." Lastly, the workers urge the court to replace its prior award of liquidated damages with an award of prejudgment interest. The defendant owners contend that the Administrator erred by refusing to charge the migrant workers for the cost of heating fuel and in denying wage deductions for those housing facilities which he found to have been furnished in violation of state law. In all other respects, the owners argue that the Administrator's decision should be affirmed. The government contends that both motions for summary judgment should be denied, and that the Administrator's decision should be affirmed in all respects.

## DISCUSSION

### I. STANDARD OF REVIEW

#### A. *Summary Judgment*

In reviewing an administrative decision, a court may grant summary judgment

---

**9.** The two facilities with initial market limitation deductions of 20% and 15%, *see* HUD Appraisal at 24, were left with a 10% and 5% reduction respectively. *See* ALJ's Recommended Decision at 39.

**10.** The fair rental values which the Administrator calculated were for 1980—the year in which the HUD appraisal was conducted. The Administrator then calculated the fair rental values for 1978, 1979, 1981, 1982, adjusting for inflation. *See* Administrator's Decision at 16.

when there is no genuine issue as to any material fact and the only dispute involves a question of law. *Soler,* 615 F.Supp. at 740 (citations omitted). In this case, there is no genuine issue as to any material fact and the only "dispute" involves issues of law. Accordingly, the parties' cross-motions for summary judgment are an appropriate vehicle for determination of the legal questions presented.

### B. *The APA*

■ Under the APA, an agency's decision may be set aside only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Thus, the scope of judicial review is narrow and the court may not substitute its judgment for that of the agency. *Soler,* 833 F.2d at 1107 (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

■ A successful challenge to an agency's decision under the arbitrary and capricious standard of review must demonstrate that the agency

> 'relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

*Soler,* 833 F.2d at 1107 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). A reviewing court can neither weigh the alternatives available to an agency and determine which is the most reasonable, nor resolve conflicts in testimony unless the testimony is patently incredible. *Id.* (citations omitted). Moreover, an agency's interpretation of its own regulation is entitled to substantial deference. *Id.* at 1108 (citation omitted). Thus, even if a reviewing court determines that an alternative

interpretation of an agency's regulation is more reasonable, the agency's interpretation will not be set aside. *Id.* (citations omitted).

### II. THE FLSA

Congress enacted the FLSA to prevent inadequate wages and excessive hours, and to provide a standard of living that would promote the health and well being of workers covered by its provisions. *See* 29 U.S.C. § 202(a); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981). The Act sets a minimum wage that employers must pay those employees covered by the statute, and permits employers to make deductions from that wage for certain cash substitutes such as housing. *See* 29 U.S.C. § 203(m). The FLSA and its implementing regulations provide that the amount of money deductible from the minimum wage for lodging is limited to either 1) the "reasonable cost" to the employer of furnishing the housing,[11] or 2) the "fair rental value" of the housing, whichever is less. *Id.;* 29 C.F.R. § 531.3(c) (1990). The parties do not dispute the ALJ's determination, adopted by the Administrator, that in this case, the "fair rental value"—rather than the "reasonable cost"—is the preferable method of valuation.

### III. PLAINTIFFS' MOTION

#### A. *The Fair Rental Value of the Housing*

##### 1. The Market Data Approach

The migrant workers argue that the Administrator's determination of the fair rental value of the on-site housing was arbitrary and was not supported by substantial evidence. Plaintiffs' Memo. in Support at 12–33. The workers note that the HUD appraisal indicated that the on-site housing existed solely for migrant workers and that there was no "substitute user" for the lodging. Further, after finding that the housing was "substandard as compared with the rental market in the area," the

---

11. The term "reasonable cost" is limited to the actual cost to the employer of furnishing the housing, and does not include a profit. 29 C.F.R. § 531.3(a) (1990).

HUD appraisal noted that "if [the housing were] offered to the general public (excluding migrant workers) there would be little or no rentals." HUD Appraisal at 6; *see* Tr. 3182–83, 3261; *see also* Tr. 4830 (similar testimony of owners' appraiser). The workers argue that since the on-site housing could not be rented to the general public, the correct application of the market data approach—which the parties do not dispute is appropriate in this case—requires that the fair market rental value be zero. Plaintiffs' Memo in Support at 19–23.

Alternatively, the workers claim that the on-site housing should have been compared to similar migrant worker housing in Orange and Ulster Counties, for which (with one exception) workers were not charged. HUD Appraisal at 5. Based on such a comparison, the workers argue that the fair market rental value of the on-site housing would again be zero. Plaintiffs' Memo. in Support at 25–27.

The workers' approach in calculating a zero market value for the on-site housing is cogent. In fact, the Administrator would have been fully justified had he rejected the HUD appraisal and found fair rental values of zero dollars. Nevertheless, that the approach proffered by the workers is reasonable does not necessarily render the approach taken by the HUD appraiser unreasonable. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1862, 104 L.Ed.2d 377 (1989) (agencies must have discretion to rely on reasonable opinions of their experts even if a court finds contrary views to be more persuasive). The court need not determine which calculated market value is the most appropriate. *See Soler*, 833 F.2d at 1107. Rather, it need only decide whether the Administrator's decision to accept the methodology employed by the HUD appraiser was arbitrary, capricious, an abuse of discretion or not in accordance with the law. *See* 5 U.S.C. § 706(2)(A).

■ After having carefully reviewed the HUD appraisal report and the methodology which was used in its preparation, the court finds that the Administrator was jus-

tified in accepting it as the basis for his determination. First, there was nothing unreasonable in the appraiser's determination that the market value of the properties was greater than zero. Simply because housing has a value only to a select group of people and is not rentable to the "general public" should not be interpreted to mean that it must have a zero market value. The point is, that there is a group—the migrant workers—to whom the appraiser reasonably found the housing had a value. Second, that the appraiser, in determining the fair rental value of on-site housing, looked to "secondary comparables" (i.e., the low income housing) rather than the "direct comparables" (i.e., other on-site farm housing in the general geographic area) does not render his appraisal unreasonable. While it is true that there were direct comparables for the appraiser to examine, they were all provided free of charge to migrant workers. Despite the workers' contention to the contrary, the fact that the direct comparables were provided free of charge does not necessarily require a finding that they have a zero market value. Rather, it indicates only that it is the custom of farm owners to provide the migrant workers with free housing. Further, the appraiser did not "ignore the direct comparables," but rather determined that they provided no guidance in setting a fair rental value. *See* Plaintiffs' Memo in Support at 27. Since the direct comparables were of no help to the HUD appraiser, he was fully justified in considering secondary comparables and making appropriate adjustments to reflect the differences between the housing being appraised and that to which it was being compared.

Moreover, the workers' argument that the HUD appraiser did not use proper appraisal methodology is weakened by the fact that the workers' own real estate expert, who accompanied the HUD appraiser on his inspections of the housing units and reviewed the final report, submitted a sworn affidavit to the ALJ which stated:

I have read the [HUD appraisal] and found it to be both practical and profes-

sional in dealing with a unique appraisal problem. It employs standard techniques and there are no radical departures from approved practices. The report covers every relevant point [and] is thorough in its analysis. I would rate it as an excellent job.

Affidavit of Carmen Panaro, sworn to July 21, 1981, ¶ 19 (Exh. J to Declaration of Steven M. Haber). Accordingly, the workers claim that it was arbitrary and capricious for the Administrator to accept the HUD appraiser's methodology is unpersuasive.

### 2. The *Otamot* Decision

A similar situation to the one at hand was recently presented in *Matter of Otamot*, 88–FLS–2, Exhs. H, I to Plaintiffs' Notice of Motion. In *Otamot*, an ALJ heard evidence concerning a Maryland farm owner's wage deductions for migrant worker housing under the FLSA. In determining the fair rental value of the housing, the ALJ credited the testimony of an expert real estate appraiser who concluded that

> due to the condition of the facilities, the rural location, and the functional utility problems (most noticably the pit toilets), in the competitive open market there appears to be little or no potential market for the rental of the subject property. The typical renter would not be willing to rent the facilities with their respective improvements. The only apparent use of the subject property in its present condition is the housing of migrant farm workers. Such workers are typically furnished with their housing and do not pay rent for their lodging. Thus, based upon the above analysis, it is the opinion

of this appraiser that the fair market rental value of the Westover Labor Camp is considered to be zero.

Recommended Decision 5–6 (quoting Appraisal Report at 13), Exh. H to Plaintiffs' Notice of Motion.

The ALJ in *Otamot* found the appraisal "convincing" and concluded that the fair market rental value of the housing was zero. *Id.* at 6. The ALJ's decision was thereafter adopted by the Acting Administrator for the Department of Labor. Final Decision and Order, Exh. I to Plaintiffs' Notice of Motion. In upholding the ALJ's recommended zero market value, the Acting Administrator relied on the appraiser's findings that there was little or no market for renting the housing to the general public and that the only apparent use for the structure in its existing condition was the housing of migrant farmworkers. *Id.* at 7–8. Relying on the *Otamot* decision, the workers argue that the fair market rental value of the housing at issue in this case must also be found to be zero.

While *Otamot* presents a similar situation to the case at hand, it is easily distinguishable in that the appraiser in *Otamot* found a zero market value while the appraiser in this case found a market value greater than zero. Moreover, the *Otamot* decision was issued in November of 1990—more than seven years after the Administrator had issued his final decision in this case. As discussed, *supra*, this court need not decide which result is the more appropriate. Rather, it need only decide whether the Administrator's decision in this case, based upon this record and which was pre-*Otamot*, was arbitrary or capricious.[12] In short, the court finds that it was not.[13]

---

**12.** That the appraisals in the two cases came to different conclusions based on similar facts does not, *ipso facto*, render either appraisal unreasonable, nor does it render their acceptance by the Administrator arbitrary or capricious. *Cf. United States v. 22.80 Acres of Land*, 839 F.2d 1362, 1365 (9th Cir.1988) ("the law is not wedded to any particular formula or method in determining "fair market value").

**13.** The court has carefully reviewed the workers' claim that the Administrator improperly considered cost factors in determining the fair

market value of the owners' housing units and finds it to be without merit. As evidence that cost factors "infected" the fair market analysis," the workers point to the Administrator's upward adjustment of $1 to each weekly rental calculated by the HUD appraiser to reflect excessive maintenance costs. *See* Administrator's Decision at 12; ALJ's Recommended Decision at 42–43. It is not disputed that the owners' wage deductions are limited to the reasonable cost of furnishing the housing or the fair rental value of the housing, whichever is less. 29 C.F.R. § 531.3(c). However, despite the workers' as-

## B. The 10% Deduction for Market Limitations

■ Alternatively, the workers challenge the Administrator's decision to disallow the HUD appraiser's 10% downward adjustment for market limitations. Plaintiffs' Memo. in Support at 33–40. The workers argue that in calculating market limitations, the HUD appraiser took into account the migrant workers' limited ability to pay rent while the Administrator considered only the location of the lodging on the farmland. Although the HUD appraiser's written report did include the workers' limited financial means within the definition of market limitations, *see* HUD Appraisal at 7, his testimony made clear that the 10% deduction was applied principally for the location of the housing on farmland, far removed from towns or villages. *See* Tr. 2971–72, 3028, 3093, 3730. Accordingly, the Administrator's decision not to apply the 10% limitation on the ground that the location of the housing on the farmland provided significant savings to the workers—e.g., transportation costs—was reasonable and is supported by substantial evidence in the record.

## C. Liquidated Damages vs. Prejudgment Interest

The workers argue that due to the excessive passage of time since the commencement of this litigation, this court's prior award of "double" liquidated damages pursuant to 29 U.S.C. § 216(b), *see Soler v. G & U, Inc.*, 628 F.Supp. 720 (S.D.N.Y.1986), is no longer sufficient to compensate them for the loss of their wages. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Plaintiffs' Memo. in Opposition") at 33. Thus, the workers have asked the court to add prejudgment interest to any underpayment of wages. Since the workers concede that they cannot be awarded both prejudgment interest and liquidated damages, *id.* at 34–35 (citing *McClanahan v. Mathews*, 440 F.2d 320, 325 (6th Cir.1971)), they have agreed to waive their entitlement to liquidated damages upon an award of prejudgment interest. *Id.* at 32–33.[14]

■ The FLSA provides that an employer who violates the Act's minimum wage provisions "shall be liable to the ... employees affected in the amount of their unpaid minimum wages ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Under this provision, liquidated damages are intended to compensate for any losses workers might suffer as a result of the wrongful retention of their pay and are not intended as a penalty or punishment. *Soler*, 628 F.Supp. at 724 (citations omitted). Similarly, prejudgment interest "serves the compensatory purpose by making up for the delay in receiving the money, during which time the employees were denied its use, and by partially offsetting the reduction in the value of the delayed wages caused by inflation." *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 58 (2d Cir.1984) (citation omitted). Thus, both liquidated damages and prejudgment interest are designed to compensate for similar losses. Whether to award the workers prejudgment interest is a matter left to the sound discretion of the court and is governed by considerations of equity and fairness. *See Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 87 (2d Cir.1980); *G & T Terminal Packaging, Co. v. Joe Phillips, Inc.*, 618 F.Supp. 127, 132 (S.D.N.Y.1985) (and cases cited therein),

---

sertion to the contrary, there is nothing in the record to indicate that the $1 increase in the weekly rental values was intended to allow the owners' to recover their actual maintenance costs. Rather, it was the means by which the Administrator chose to represent the effect of the unusually high maintenance costs—attributable, at least in part, to the workers' abuse of the premises—upon the fair rental value of the housing. As noted by the ALJ and adopted by the Administrator: "A lodging facility with broken windows, holes in the walls and other sim-

ilar occupant inflicted damage certainly has less value for housing people, migrant or otherwise, than a similar facility without these defects." *Id.*

14. For the reasons set forth in its prior opinion, *see Soler*, 615 F.Supp. at 724–26, the court declines the owners' invitation to "reconsider" the award of liquidated damages to the workers. *See* Defendants' Memo. in Support at 35–42.

*rev'd on other grounds,* 798 F.2d 579 (2d Cir.1986).[15]

■ The statutory "double" liquidated damages award provides a widely variable effective interest rate. For example, if the double damages are awarded one year after the violoation, the effective interest rate is 100%. However, if the damages are awarded five years after the violation, the effective interest rate would drop to 20%. In this case, however, the workers have been deprived of their unpaid wages for well over a decade. In this case, therefore, the significance of the statutory double damage award is severely undermined. Accordingly, after carefully reviewing the parties submissions, the court has determined that its prior award of liquidated damages should be replaced with an award of annually compounded prejudgment interest at the adjusted prime rate. *See E.E.O.C. v. County of Erie,* 751 F.2d 79 (2d Cir.1984) (approving of the adjusted prime rate as a "good indicator of the value of the use of money"). Such an award is necessary in order to fairly compensate the workers for the losses they have suffered—and will continue to suffer until they are paid—as a result of the unlawful retention of their wages.

## IV. DEFENDANTS' MOTION

### A. *The Cost of Heating Fuel*

■ The FLSA defines an employee's "wage" to include "the reasonable cost ... to the employer of furnishing [the] employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by [the] employer to his [or her] employees." 29 U.S.C. § 203(m). In his recommended decision, the ALJ found that the cost of heating fuel was deductible from the workers' minimum wage since it was included within the regulatory definition of "other facilities" which were customarily furnished to migrant workers by the owners. ALJ's Recommended Decision at 27–28, 53; *see* 29 C.F.R. § 531.32 (listing "fuel" within the meaning of "other facilities"). The Administrator rejected the ALJ's recommendation, finding instead that the cost of providing heating fuel between September 1 and May 1 is, according to state law, a cost to be borne by the owners. Administrator's Decision at 14. In particular, the Administrator relied on the New York State Sanitary Code which provides that

[a]ll rooms used or occupied between September 1 and May 1 ... must have heating facilities which are ... capable of maintaining a minimum temperature of 68 degrees Fahrenheit in each room.... *The fuel or power necessary to meet the above requirement[ ] shall be provided free of charge to the occupants by the permittee.*

10 N.Y.C.R.R. § 15.6(i) (emphasis added). Since § 218(a) of the FLSA provides that no federal law or provision therein "shall excuse noncompliance with any ... State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter," the Administrator ruled that the conflict between 10 N.Y.C.R.R. § 15.6(i) and 29 C.F.R. § 531.32 must be resolved in favor of § 15.-6(i) which would provide the workers with a higher minimum wage.[16]

The owners raise two arguments concerning the deductibility of heating costs from the workers' wages. First, they contend that § 15.6(i) of the Sanitary Code is not a "State law ... establishing a minimum wage" within the meaning of the FLSA. *See* 29 U.S.C. § 218(a). The own-

---

**15.** The owners do not contest the court's authority in this case to substitute prejudgment interest for the liquidated damages provided for under § 216(b) of the FLSA. Rather, the owners argue solely that an "assessment of the equities" indicates that an award of prejudgment interest is unwarranted. Defendants' Reply Memorandum of Law in Support of Partial Summary Judgment ("Defendants' Reply Memo. in Support") at 36–41.

**16.** The ALJ did not address 29 U.S.C. § 218(a), and held—based on general case law—that federal law preempts state law where the former "so fills a particular area of the law [that] there is no room for state and local legislation." ALJ's Recommended Decision at 27–28. Section 218(a), however, specifically mandates that state law, rather than federal law, applies where the state law provides for—as it does here—a higher minimum wage.

ers assert that the regulation of wages in New York "is entrusted solely to the New York State Department of Labor." Defendants' Memorandum in Support of Partial Summary Judgment ("Defendants' Memo. in Support") at 27. Irrespective of the owners' contention, it is clear that if 10 N.Y.C.R.R. § 15.6(i) is applied in this case and the cost of heating fuel is excluded from wages, the workers' minimum wage would be higher than if 29 C.F.R. § 531.32 is applied. Accordingly, the Administrator held that § 15.6(i) "establish[es] a minimum wage higher than the minimum wage under [the FLSA]," *see* 29 U.S.C. § 218(a), and that, therefore, § 15.6(i) governs. The court finds the Administrator's interpretation of the FLSA to be both reasonable and persuasive, and thus entitled to deference. *See Niagara Frontier Tariff Bureau, Inc. v. United States*, 826 F.2d 1186, 1190–91 (2d Cir.1987) (agency's interpretation of a statute which it administers is entitled to considerable deference, and should be followed unless there are compelling reasons that it is wrong or is based on an impermissible construction of the statute; agency's interpretation need only be sufficiently rational or reasonable).

Second, the owners argue that § 15.6(i) does not prohibit heating costs from being included in determining the fair market rental value of the housing, but rather, only prevents the owners from imposing on the workers a separate charge for the cost of heating the facilities from September 1 to May 1. Defendants' Memo. in Support at 27; Defendants' Reply Memo. in Support at 35–36. It is true that in this case the workers were not charged separately for any heating costs. Nevertheless, including heating costs in calculating the fair rental value of the housing and then deducting the fair rental value from the workers' minimum wage would have the identical negative impact on the workers as would imposing a separate charge for heating costs. In both scenarios—either by wage deductions or by a separate charge—the workers are forced to pay for heating costs

when New York law requires that those costs be borne by the owners. Thus, the Administrator's decision not to make the workers pay—either directly or indirectly—for heating costs was proper and is therefore affirmed.

### B. *Facilities Without Heating*

Federal regulations provide that the owners can not make any wage deductions for "[f]acilities furnished in violation of any Federal, State, or local law, ordinance or prohibition." 29 C.F.R. § 531.21. The relevant section of the New York State Sanitary Code which applies to migrant farmworkers' lodgings provides that "[a]ll rooms used or occupied between September 1 and May 1, including bathrooms, shower rooms and washrooms must have heating facilities which are properly vented and shielded...." 10 NYCRR § 15.6(i). This provision has the force and effect of law. *See Aerated Products Co. v. Godfrey*, 290 N.Y. 92, 48 N.E.2d 275 (1943).

In his decision, the Administrator denied wage deductions for certain housing units which he found lacked heating in violation of New York law. *See* 29 C.F.R. § 531.31. In particular, he found that three housing units lacked heating in their living areas and that three units lacked heating in their outside privies. Amended Decision at 4.[17] The Administrator based his findings on the information provided in the HUD appraisal, which reached the same conclusion. *Id.* The owners argue that the Administrator's determination must be reversed because 1) his conclusion with respect to the privies is based on an erroneous interpretation of the New York State Sanitary Code, and 2) his conclusion with respect to the living areas is not supported by substantial evidence. Defendants' Memo. in Support at 12–24; Defendants' Reply Memo. in Support at 8–21.

#### 1. The Privies

The growers concede that the privies in question were not heated. Defendants' Re-

---

**17.** The Administrator's findings with respect to the lack of heating at Sobiech Farms, *see* Amended Decision at 4, is not relevant in this case since Sobiech Farms is not a party to this lawsuit.

ply Memo. in Support at 10. Further, the parties agree that the Orange County Department of Health ("OCDOH") is properly charged by the New York State Department of Health with the enforcement of the State Sanitary Code. *See* Defendants' Memo. in Support at 14; Defendants' Reply Memo. in Support at 10; Plaintiffs' Memo. in Opposition at 6. Nor is it disputed that the "Part 15 Official Interpretations and Guidelines" ("Official Interpretation") of the OCDOH, explicitly exempts privies from the heating requirements of § 15.6(i) of the Sanitary Code. The owners argue, however, that the Administrator erred by ignoring the OCDOH's Official Interpretation. In response, the workers claim that the Administrator acted reasonably in ignoring the Official Interpretation since it is inconsistent with the plain language of § 15.6(i) which requires that *"all rooms including bathrooms"* be provided with heat. 10 N.Y.C.R.R. 15.6(i) (emphasis added).[18]

■ It is well settled law that deference must be accorded to an agency's interpretation of a statute which it is authorized to administer. *See St. Mary's Hosp. of Troy v. Blue Cross & Blue Shield Ass'n/ Blue Cross and Blue Shield of Greater New York*, 788 F.2d 888 (2d Cir.1986); *see also Johnson v. Joy*, 48 N.Y.2d 689, 422 N.Y.S.2d 56, 397 N.E.2d 746 (1979) (agency's interpretation of a statute which it is responsible to administer will be upheld unless it is irrational or unreasonable). Deference to an agency's interpretation is constrained, however, by the obligation to honor the clear meaning of the statutory language. *See Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). Thus, the question which needs to be decided is whether Orange County's interpretation of § 15.6(i) is inconsistent with the plain statutory language of that section, such that the Administrator would have been justified in ignoring the Official Interpretation. More precisely, the issue is whether it is plain and clear that "all rooms including bathrooms" within the meaning of § 15.6(i) includes privies. In short, it is the opinion of this court that neither the word "room" nor "bathroom"—on its face—includes a privy.[19] Thus, the Official Interpretation of § 15.6(i), which the court finds to be reasonable, is not inconsistent with the plain language of the Sanitary Code. Accordingly, the Administrator's failure to give deference to the Official Interpretation without any explanation was both arbitrary and capricious, and his denial of wage deductions for those units whose privies lacked heating must therefore be reversed.[20]

## 2. The Living Areas

■ The owners argue that the Administrator's denial of wage deductions for the housing units whose living areas he found lacked heating facilities must be reversed since it was not supported by substantial evidence. Defendants' Memo. in Support at 13. In support of their position, the owners note that in making his finding the

18. The government argues that there is no evidence that the Official Interpretation relating to § 15.6(i) was presented to either the ALJ or the Administrator. Government's Memorandum of Law in Opposition to Cross–Motions for Partial Summary Judgment ("Government's Memo. in Opposition") at 18–20. However, the owners have provided the court with a copy of the relevant pages of the administrative record where the Official Interpretation can be found. Administrative Record at 771–72, Exh. E to Declaration of Edward F. Beane. Accordingly, the government's claim is without merit.

19. The court need not actually resolve this question of statutory interpretation. Rather, it is sufficient for purposes of this motion that the statutory language is not dispositive on its face.

20. The Administrator never even addressed the Official Interpretation which, as discussed *supra* at note 18, was part of the administrative record. In his decision, the Administrator noted the facilities whose privies lacked heating and indicated that they were being denied wage deductions because there was no heat in the privies between September 1 and May 1 "in violation of state law." Amended Decision at 4. Nowhere in his decision did the Administrator indicate that he viewed the Official Interpretation as being inconsistent with the statutory language. In fact, not once in his decision did the Administrator refer or cite to the Official Interpretation.

Administrator relied on the HUD appraisal, which was based on inspections of the on-site housing units made in October 1980—more than one year after the occupancy at issue.[21] Defendants' Memo. in Support at 17, 24; Government's Memo. in Opposition at 14. Moreover, the owners cite twenty-eight OCDOH inspections of their various housing units conducted between September 1 and May 1 of both 1978 and 1979, none of which reveal a lack of heating facilities as required by § 15.6(i) of the Sanitary Code. *See* Exh. A to Declaration of Edward F. Beane.[22]

As an initial matter, the HUD appraisal was not conducted "to cite or enforce [State Sanitary Code] violations." HUD Appraisal at 3. Moreover, the HUD appraiser did not read the State Sanitary Code until after his inspection of the housing units and explicitly noted that the Code did not affect the outcome of his report. *Id.* The OCDOH inspections, however, were conducted specifically for the purpose of, *inter alia*, enforcing § 15.6(i) of the Sanitary Code. The official inspection reports completed by the OCDOH inspectors included the following items under the category "Housing and Sanitation":

No. 38. Stoves and heaters of approved type. Electrical Types Grounded.

No. 39. Hot water and heating facilities properly installed and vented.

No. 40. Temperature at least 68 degrees Fahrenheit where and/or as required.

Each of the inspections of the growers' housing units indicated, with one exception, *see supra* n. 22, compliance with all of the above items. Further, all of the housing units which the Administrator found to lack heating facilities were among those represented by the OCDOH inspection reports indicating the contrary.

In short, the only evidence in the record concerning the existence of heating facilities in the housing units during the period of time relevant to the administrative hearing indicates that there was compliance with § 15.6(i) of the Sanitary Code. *See* ALJ's Recommended Decision at 5 (indicating that administrative hearing limited to evidence concerning 1978 and 1979); *see also*, ALJ's Recommended Decision at 23–24 (indicating that the evidence does not support a finding of lack of heating). Thus, the court finds that the Administrator's reliance on the information supplied in the HUD appraisal while ignoring the twenty-eight OCDOH inspections constitutes a clear error of judgment and reliance on nonrational factors.[23] As such, the denial of wage deductions to the units in question was arbitrary and capricious and must be reversed. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

C. *Overcrowding at Bierstine Farms, Inc. Labor Camp # 2*

The Administrator adopted the ALJ's finding that one of the owners' camps—Bierstine Farms, Inc. Labor Camp # 2 ("Bierstine")—was not entitled to wage deductions for the period of July 25, 1979 to

---

**21.** Although this case involves wage deductions for the 1978–83 growing seasons, the administrative hearing was limited to evidence pertaining to 1978 and 1979. *See* ALJ's Recommended Decision at 5; Tr. 5286, 5288, 5515, 5516. The growers do not challenge the findings of the HUD appraiser regarding the lack of heating facilities in October 1980. Rather, they claim that the Administrator's reliance on such after-the-fact findings is arbitrary and capricious.

**22.** While none of the inspection reports indicate a lack of heating facilities in any of the owners' housing units, there is one report—relating to an inspection of Charles Gratz Farm—which indicates that the temperature of the housing at that farm was not at least 68 degrees Fahrenheit as required by § 15.6(i) of the Sanitary Code.

Although the housing units at Charles Gratz Farm were among those which were denied wage deductions, the Administrator's decision was based on his finding that the housing units at that farm "lacked heating facilities," not that the temperature was below 68 degrees. *See* Amended Decision at 4.

**23.** The Administrator failed to indicate why he did not credit the OCDOH inspection reports. Rather, he indicated only that:

Although the Board of Health records for 1978 and 1979 do not indicate violations involving heating with respect to such facilities, the [HUD] Appraisal Report found a lack of heating facilities in [several of the growers' living units].

Amended Decision at 4.

August 22, 1979, since during that time, the camp was operated in violation of its state permit. The Administrator found that well over thirty people—the number allowed by the permit—were living in the camp at that time. Administrator's Decision at 8, 13–14; ALJ's Recommended Decision at 19–20; see 29 C.F.R. § 531.31.

The owners do not dispute 1) that Bierstine was limited, by a valid state permit, to occupancy by no more than thirty people; 2) that on July 25, 1979 the OC-DOH issued a notice that Bierstine was being occupied by fifty-one people, see Tr. 3700; 3) that on August 1, 1979 Bierstine was issued a "Notice to Discontinue Violations," which indicated that the camp was and continued to be in violation of Part 15 of the Sanitary Code, see Tr. 3731–32; 4) that on August 7, 1979 Bierstine was issued a "Notice of Hearing," which stated that forty-six people were living in the camp; 5) that on August 22, 1979 an OC-DOH inspector found that forty-three people were living in the camp, see Tr. 3696; and 6) that on August 27, 1979, after holding a hearing on the occupancy issue, a Department of Health ALJ found that Bierstine had operated in violation of the State Sanitary Code and assessed a $100 fine. Rather, the owners argue that the overcrowding did not rise to the level of a violation of state law under the FLSA. They note that in imposing the $100 fine, the ALJ found that the permit violation had already been corrected. Defendants' Memo. in Support at 29. The owners also argue that "substantial compliance" with the Sanitary Code is all that is required and that the "unintentional and temporary" overcrowding of the Bierstine camp should not result in the loss of any housing deductions. Id. The owners' arguments, however, are unpersuasive.

First, the ALJ's finding on August 27, 1979 that the permit violations had been corrected by that date—and may therefore be considered "temporary"—does not in any way controvert the Administrator's finding that the camp was being operated in violation of the permit between July 27 and August 22, 1979. Second, the applicable regulation, 29 C.F.R. § 531.31, explicitly provides that housing deductions are not permitted for "[f]acilities furnished in violation of any Federal, State, or local law." Thus, the owners' claim that "substantial compliance" with the law is sufficient is unfounded.[24] Third, there is considerable evidence in the record to indicate that the overcrowding was deliberate rather than "unintentional." See Tr. 3723, 1867–68. Accordingly, the Administrator's finding of a permit violation at the Bierstine camp between July 25 and August 22, 1979, and his denial of wage deductions for that period, was proper.

### D. Operation of Grippe House Without a Permit

Both the ALJ and the Administrator found that one of the owners, G & U, Inc., operated Grippe House as migrant worker housing without a permit in 1978 and 1979. See ALJ Recommended Decision at 21–22; Administrator's Decision at 14. Since operation of a migrant camp without a permit violates state law, see 10 N.Y.C.R.R. § 15.-20, the Administrator denied G & U, Inc. any wage deductions for the Grippe House. See 29 C.F.R. § 531.31.

The owners argue that Grippe House did not require a permit as a migrant camp because it was occupied "only by year round employees." Defendants' Memo. in Support at 30; see 10 N.Y.C.R.R. § 15.2. Nevertheless, G & U, Inc.'s Management Assistant, Horace Smith, testified on direct examination that in 1978, Grippe House was occupied by migrant workers. Tr. 2495. He testified further that he knew of no time when the facility was occupied by anybody besides migrant workers. Id. G & U, Inc.'s General Manager, Stanley Urbanski, also testified that the Grippe House was a facility for the migrant workers and that it was not occupied during the entire year—at least in 1978 and 1979. See Tr. 2662. In addition, he testified that the electricity in the Grippe House was disconnected in October 1979 and was not reconnected until the

---

**24.** The owners' reliance on *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217 (7th Cir.1981), is mis- placed as that case did not interpret or apply 29 C.F.R. § 531.31.

spring, thus indicating that nobody occupied the facility during that time. *Id.* In short, there is substantial evidence to support the Administrator's finding that Grippe House was operated as migrant housing without a permit. Therefore, his denial of wage deductions for Grippe House is affirmed.[25]

## CONCLUSION

For the reasons set forth above, that portion of the Administrator's decision which denied wage deductions for those housing units which he found lacked proper heating units is set aside. In all other respects the Administrator's decision is affirmed. Further, the court's prior award to plaintiffs of liquidated damages is replaced with an award of compounded prejudgment interest at the adjusted prime rate. Accordingly, the parties' motions for partial summary judgment are granted in part and denied in part.

Counsel for the parties are hereby ordered to compute the amount due to the workers as a result of the owners' unlawful retention of their wages, and are directed to submit judgment within fifteen days.

So ordered.

---

**25.** The court has reviewed the owners' statute of limitations argument and finds it to be without merit.